The opinion of the court was delivered by
Monroe, J.
Plaintiff claims $5,000.00 as damages for personal injuries alleged to have been sustained through the negligence of the defendant, by whom he was employed. Defendant denies the negligence imputed to it, and alleges that if plaintiff’s injuries are the results of negligence, it was that of himself and a fellow servant. There was a verdict and judgment for the plaintiff in the sum of $2,500.00 and defendant has appealed.
The ease as we find it, from the evidence in the record, is as follows:
W. K Henderson, W. N. Morrison, and probably some other persons, not named, organized the defendant company, the two gentlemen named being the principal, if not the only stockholders and occupying the positions of president and superintendent, respectively. In *1110 February and March, 1898, they established a saw-mill at Vivian, some distance out from Shreveport. The boiler and engine set up by them seem to have been second-hand, and were purchased, or otherwise acquired, from different persons. No one knew how old the boiler was, though it is said to have been made sound by patching; and the nearest that we are able to come to the age of the engine is from the testimony of Morrison to the effect that .he knew it to have been in operation in 1889, but how long before he was unable to say. When the mill v/as first put up, a fourteen-inch belt was used for the main driving wheel, but, shortly afterwards, a wider belt was obtained, and it became necessary to provide aii “idler” of corresponding width, in place of the one which had been in use in connection with the narrower belt. An “idler,” otherwise called a “tightener,” is a pulley on the end of a hinged or swinging shaft, the function of which, in this case, was to bear down on the main belt so as to control the slack and prevent the belt from unduly oscilating or flapping, and possibly, in that way, to conserve the power. The defendant had no pulley, at the time, that was suitable for the purpose, and its president, who is engaged in the mercantile and machinery business in Shreveport, sent, from his establishment, a couple of ten-inch wooden pulleys, made in sections and bolted or riveted together, which he had on hand, instead of the twenty-inch iron pulley which was obtained after the accident out of which this suit arose. Morrison, who had charge of 'the mill, however, stated, at the time, to several persons, and stated to the plaintiff, either then or afterwards, that the wooden pulley was put in temporarily and would be replaced by one better suited to the work. The plaintiff was employed, not a great while after the mill started, as a sawyer, and his duty was to handle the logs and to regulate the saws in their work of converting the logs into lumber. In the discharge of this duty, he occupied a position on a platform near the saws, and was elevated above the engine and out of sight of it. Near him was a rope which came through the floor of the platform, by pulling- which it was supposed that he would be able to check or stop the engine. Under what circumstances he was expected to make use of this rope does not appear clearly, but it is quite certain that it was put there to be used by him. Some time in October, 1898, Morrison employed one Loveless in the double capacity of fireman and engineer. He testifies that he had known Loveless years ago in Missouri, and that he had employed him in 1885, since which date it does not *1111 appear that he had seen anything of him until he put him in charge of the defendant’s engine. The witness states that, when he knew Loveless in Missouri, he was working as a fireman and second engineer, and that he was then sober and industrious, and a capable “fireman.” As against this, Iiardy, a witness with whom Loveless boarded whilst he worked at the mill gives this testimony: *
“Q. — He was not what you would call a regular old sot, all the time drunk ?
“A. — I think he was, every time he' got a chance at it.
“Q. — If he got a chance at it ?
“A. — Yes, sir.
“Q. — Was he drunk all the time?
“A. — He did not get a chance all the time, (unless?) he got out of money.
“Q. — Did he have money all the time ? ' •
“A. — I never saw him with a cent in my life.”
Re-Examined.
“Q. — You never saw him with a cent, because he spent it all for liquor ?
“A. — I suppose he did; I never saw him with a cent.
“Q. — Was he drunk a great deal of the time?
“A. — It was like this; ‘he was drunk when he could get whiskey, I expect.’ ”
And this testimony is rather corroborated by that of some other witnesses; Jatlin, for instance, who testifies that Loveless was discharged for drinking and allowing the boilers to go dry. Morrison, upon the other hand, says that he was discharged for putting saw dust into the injector, and condemning the injector as worthless, and that he, Morrison, never saw him drunk, or smelled whiskey about him. Be that as it may, Loveless was not retained more than ten days or a fortnight after the accident to the plaintiff, and the defendant was unable to find him in order to obtain his testimony.
On the morning of October 17, 1898, about nine o’clock, the plaintiff was at his post at work, when the engine ran away. He stepped to the rope, in order to check it, but was unable to do so, and a very high rate of speed was attained. At that moment the wooden pulley, called the “idler,” to which the motion of the main belt had been eommuni *1112 cated, burst in pieces, and one, or more, of the pieces, broke the plaintiff’s leg above, and in, the knee joint, and also between the knee and the ankle. Loveless was at that time eighteen feet away from the engine on the top of the boiler, engaged in regulating the feed which supplies the saw-dust fuel to the furnace. He appeared to be perfectly helpless in the emergency, and the engine was finally stopped by 'the aid of Jatlin, a workman who was operating an “edger” at some distance from it. The plaintiff was taken home, and the first .impression was that his leg would have to be amputated, but he was carried by rail to Shreveport the next day, placed in an infirmary, the wounded member kept in plaster of paris for nine weeks, and, eventually, he became able to go about, though he had done no work up to the date of the trial. His leg is half an inch shorter, his knee somewhat stiff, and the testimony tends to show that he will never have as good service from it as he had before the accident. Being about forty-two years of age, however, the expert’s opinion is that his condition will improve. ’ '
The evidence as to the cause of the engine’s running away develops the fact that the “governor” was out of order, and that the fireman and engineer was, as has been stated, eighteen feet away, on the top of the boiler, looking after an arrangement supposed to be automatic, whereby the saw-dust, which was used as fuel, was supplied to the furnace. A subsequent examination by Mr. Morrison of the “governor,” which was intended, automatically, to regulate the speed of ■the engine, showed some scale, or scales, in it which prevented it from working properly. How long it had been in that condition, no one could say. The plaintiff, however, testifies that the engine had run away a few weeks before that, and, to quote his language, “Mr. Morrison claimed that he had fixed the engine, he said he had found out what was the matter with it, that the governor didn’t control the engine, but he said everything was all right, then.”
“Q. — Did he say it would run away again, or would not ?
“A. — He said he had found out what was the matter with the governor, and had had it fixed, that there was not any more danger.”
It is true that Morrison denies this statement; but then Morrison denies that the engine ran away after the accident, whereas there are several witnesses, who have no interest at stake, who testify that it did run away, several times, after the accident, and was stopped by the engineer or fireman, and not by the governor. Upon the subject of the *1113 pulley, it appears that the ten-inch pulleys were good enough, in their way; that is, for use on stationary shafts, with belts running over them; but that wooden pulleys, made in sections which are fastened together, are not safe for “idlers,” and that, where a twenty-inch “idler” is required, it does not answer the purpose, but is very unsafe, to make it up of two ten-inch, sectional, wooden pulleys, placed side by side, as was done in this case, and fastened together, or not fastened together, as the case may be. There are several witnesses who testify that Morrison, who had charge of'the mill, said that the arrangement was a temporary one, and we are satisfied that he appreciated the fact that the pulley was not of the proper kind, and that it was dangerous; but he seems to have preferred that the men working in the mill should take the risk, rather than concern himself about getting another one.
We have, therefore, a patched boiler, an engine, with a governor known to be defective; and both engine and boiler, acquired at secondhand, and of an age beyond the knowledge of any of the witnesses. To which, add a man in charge of the engine, acting in the double capacity of engineer and fireman, who was never sober when he could get drunk, who was, at the moment of the accident, engaged in the work of a fireman, at a distance from the engine, and who, when the engine ran away, was not enough of an engineer, to know what to do without the assistance of a mill hand who makes no pretence that he is an engineer at all. Further than this, we have a pulley assigned to work which it was incapable of performing safely, to the knowledge, not only of the superintendent of the mill, but of persons less well informed. And finally^ as a result of it all, there is an accident, and a working man, who must live by his labor, is badly crippled, in an effort to save himself and the property of his employers from the consequences of their own recklessness.
We think that, upon principle and authority, the plaintiff: is entitled to recover:
> 1. Because the running away of the engine was a result of a defect in. the governor, which the defendant knew, or ought to have known.
2. Because, if the engineer had been competent, or the defendant had employed, a fireman to assist him, one or the other of them might have checked the runaway.
*1114 3. Because two ten-inch, split, wooden pulleys were an unsafe substitute for a twenty-inch pulley, whether wood or iron, to be used as an “idler.”
■ 4. Because the plaintiff was subjected to dangers, by reason of defective and insufficient appliances, and an incompetent engineer, which were not incidental to the business in which he was engaged, and from which he was entitled to protection through the presumed knowledge and intelligence of his employer.
Poirer vs. Carroll, 35 Ann., 699; Towns & Wife vs. R. R. Co., 37 Ann., 630; McFee vs. R. R. Co., 42 Ann., 791; Bomar vs. R. R. Co., 42 Ann., 983; Mattise vs. Ice Co., 46 Ann., 1535; Meyers vs. R. R. Co., 49 Ann., 27; Stucke vs. R. R. Co., 50 Ann., 173; Hough vs. T. & P. R. R. Co., 100 U. S., 212.
As to the amount to which he is entitled, the evidence shows that he is forty-two years of age, that he earns his living by manual labor, that he was receiving fifty-two dollars a month when injured, and that up to the date of the trial, he had lost eight months time, or over $400.00, and was still not in a condition to do the work which he had done before.
It also shows that he had paid his surgeon $183.50. Under these circumstances, we repeat what was said in the case of Mullins vs. Blaise, 37 Ann., 92, to-wit: “Where the verdict of the jury is not manifestly excessive, and when we can feel no certainty that any modification thereof would come nearer exact retribution, we are not justified in disturbing it.”
The judgment appealed from is therefore aflirmed.