## Phillips v. Moore.

1. A sale of lands in Texas, made before her separation from Mexico, by a citizen to a non-resident alien, passed the title to the latter, who thereby acquired a defeasible estate in them, which he could hold until deprived thereof by the supreme authority, upon the official ascertainment of the fact of his non-residence and alienage, or upon the denouncement of a private citizen.

2. The court below properly allowed the plaintiff to file in the case a new petition, not differing in any substantial particular from the original, which was lost, without his fault.

3. The concluding clause of the third section of the act entitled "An Act to determine the jurisdiction of circuit courts of the United States, and to regulate the removal of causes from State courts, and for other purposes," approved March 3, 1875 (18 Stat., part 3, 470), does not repeal the provision of the Revised Statutes authorizing the court to try, upon the stipulation of parties, issues of fact without the intervention of a jury.

Error to the Circuit Court of the United States for the Eastern District of Texas.

This was an action by Moore against Phillips and Hancock to recover possession of a tract of land in Texas. There was a finding and judgment against the defendants, who thereupon sued out this writ of error.

The facts are stated in the opinion of the court.

Submitted on printed arguments by *Mr. W. P. Ballinger* for the plaintiffs in error, and by *Mr. D. D. Atchison* for the defendant in error.

Mr. Justice Field delivered the opinion of the court.

This is an action to recover the possession of one-fourth of a league of land, situated in the county of Wharton, in the State of Texas. The plaintiff claims the land under a grant of the State of Coahuila and Texas, made in April, 1833, to one John Dinsmore, a colonist, under the contract with the

Empresario Stephen Austin. The defendants assert title to it
under a previous grant from that State, made in August, 1824,
to one Bartlett Sims, a similar colonist. No question is raised
as to the genuineness or validity of this grant to Sims, which
was for one league; but, in May, 1828, he sold one-fourth of it,
constituting the property in controversy, to one Kinchen Holli-
man, a resident and citizen of Mississippi, who never became a
resident or citizen of Mexico or Texas. In 1833, Dinsmore
presented a petition to the commissioner of the State ap-
pointed to distribute lands to the colonists, and to issue titles
to them, in which he denounced the tract thus sold as vacant
land, by reason of the non-residence and alienage of Holliman,
and prayed a grant of it to himself. Upon reference of the
petition to the agent of the empresario and to the alcalde of
the place, the sale of the premises to Holliman and his alienage
and non-residence were officially established, and their opinion
obtained that he could not, under the laws, retain a right to the
tract. The commissioner thereupon declared the land to be
vacant, and conceded it to the petitioner, and directed that a
survey be made of it, preparatory to the issue of the title.
Such survey having been made, a formal document, as evidence
of the transfer of the title, was issued to the petitioner, by
which the commissioner, in the name of the State of Coahuila
and Texas, granted to him the property in question. The
validity of this grant is the principal question presented for
our determination.

The contention of the defendants is that the sale of Sims to
Holliman was invalid by reason of the latter's alienage and
non-residence, and as a consequence that the title did not pass
to him, but remained in Sims, and the tract sold was not sub-
ject to be regranted as vacant land.

There is some conflict of opinion in the decisions of the
Supreme Court of Texas as to the effect upon the title
of a sale of real property to a non-resident alien. Language
properly applicable to grants to aliens under the colonization
laws, and the instructions to the commissioner under the
contract with the Empresario Austin, has sometimes been
used with reference to sales to them by private parties. Such
grants to non-resident aliens were inhibited by positive statu-

tory provisions, and for the obvious reason that the object of the colonization laws was to induce a settlement of the country by the introduction of persons who would cultivate the lands and become permanent residents; and this object would have been defeated, if such residence and cultivation had not been essential conditions upon which the bounty of the government was bestowed. For a similar reason, an abandonment of the country by the settler, after receiving his grant, without previous alienation of it, worked a forfeiture of the property, which immediately reverted to the mass of the public domain. The settler, after the performance of certain conditions, could, however, alienate his land, subject to some restrictions. In the early cases, particularly in *The Heirs of Holliman* v. *Peebles* (1 Tex. 673), an opinion was expressed, that under the laws of Spain, which remained in force in Mexico after her independence, and those subsequently enacted by her, an alien could not acquire real property in that republic. And in *Clay* v. *Clay*, in the 26th of Texas, the invalidity of a sale of land to a non-resident alien was expressly adjudged. But in the later case of *Barrett* v. *Kelly*, in the 31st of Texas, where land had been sold, in 1833, to citizens of the United States, then non-resident aliens, it was held that, unless there was an adjudication by some court or political authority upon their alienage, while it existed, their rights were not devested. The decision proceeded upon the ground that the title had passed to the grantees, notwithstanding their alienage, though subject to be devested upon an official determination of that fact.

According to this decision, considered with reference to the general prohibitory language of the laws of Mexico, respecting the acquisition of real property by aliens, in force in Texas previous to the latter's independence, the rule which there obtained may be stated to have been substantially this: that a non-resident alien could not acquire, under a sale by a citizen, such an interest in land as to be able to hold it against the government, or to prevent it being denounced and adjudged to be vacant land, subject to be regranted; but that the title would pass out of the vendor, so as to denude him of all estate in the land and consequent dominion over it; and the purchaser would take the title and hold it until, in some official way, the fact of non-

residence and alienage was authoritatively established, when the general law would come into operation, and restore the property to the public domain.    Certain it is that, by the sale to the alien, the right of the vendor was deemed to be devested; and, so far as the present case is concerned, it is immaterial whether the title be considered as thereupon at once vesting in the government by reason of the attempted transfer of the property to a person incapable of taking it, or be deemed to pass to the alien, to be held until the government, upon its own motion, or the denouncement of a private citizen, should determine to claim the property.    We are led to the latter view as the more reasonable one, and as being in harmony with the general doctrine obtaining in other cases, that a forfeiture incurred is inoperative to defeat a title until the party authorized to enforce it claims its benefit.

This conclusion is strengthened by the act of the Mexican Congress of March 12, 1828, in relation to passports and the mode of acquiring property by foreigners.    Its sixth article provides that foreigners, introduced and established in the country in conformity to prescribed regulations, shall be protected by the laws, and enjoy the same rights conferred upon Mexicans, with the exception of acquiring landed property, which, by existing law, unnaturalized persons cannot hold. But yet the eleventh article of the same act declares that property acquired by unnaturalized foreigners, in fraud of the law, may be denounced by any Mexican, to whom it will be adjudged as soon as such fraud is proved.    It would thus seem that, notwithstanding the prohibitory language of the sixth article, title may pass to a foreigner not naturalized, though it be one which is defeasible, upon the denouncement of a private citizen.

The Supreme Court of California, on the question as to the validity of a conveyance of land in Mexico, by a private citizen to an alien, held, after a full and elaborate consideration, that the conveyance was not absolutely void, but that the grantor by it was devested of the property which he had undertaken to convey, and the grantee invested with a defeasible estate therein, which he would hold until devested by the supreme authority, or by an inquisition had upon its denouncement.    *Merle* v. *Matthews*, 26 Cal. 456.

By the common law, an alien cannot acquire real property by operation of law, but may take it by act of the grantor, and hold it until office found; that is, until the fact of alienage is authoritatively established by a public officer, upon an inquest held at the instance of the government. The proceeding which contains the finding of the fact upon the inquest of the officer is technically designated in the books of law as " office found." It removes the fact, upon the existence of which the law devests the estate and transfers it to the government, from the region of uncertainty, and makes it a matter of record. It was devised, according to the old law-writers, as an authentic means to give the king his right by solemn matter of record, without which he in general could neither take nor part with any thing; for it was deemed " a part of the liberties of England, and greatly for the safety of the subject, that the king may not enter upon or seize any man's possessions upon bare surmises, without the intervention of a jury."

By the civil law, some proceeding, equivalent in its substantive features, was also essential to take the fact of alienage from being a matter of mere surmise and conjecture, and to make it a matter of record. Such a proceeding was usually had before the local magistrate or council, and might be taken at the instance of the government, or upon the denouncement of a private citizen. The course pursued in the present case seems to have been in conformity with common usage. The fact of alienage and non-residence was thus officially established; it became matter of record, and the subsequent declaration of the commissioner, that the land was vacant, was the judgment which the law prescribed in such cases. The land was then subject to be regranted by the commissioner, as fully as though no previous grant to Sims had ever been made.

It remains to consider the objections urged to the order of the court, allowing a new petition to be filed in place of the original, which was lost, and to the trial of the case by the court, without the intervention of a jury. We do not consider either of these objections to be well taken. It was not only proper to allow the filing of a new petition, when the original was lost, and no copy was to be had, but it would have been the subject of just complaint had this allowance been refused

The affidavit states that the loss was without the fault of the plaintiff, and there is no pretence that the fact was otherwise. The original petition was in the ordinary form in use in actions of trespass to try the title to land, and was for the recovery of one-fourth of a league; and there is no suggestion that the new petition differs from it in any substantial particular.

As to the trial by the court, it is sufficient to observe that a jury was waived by stipulation of the parties, filed with the clerk under the act of Congress. Rev. Stat., sect. 649. The concluding clause of the third section of the act of March 3, 1875, " to determine the jurisdiction of the circuit courts of the United States, and to regulate the removal of causes from State courts, and for other purposes," does not repeal the previous law, authorizing a trial by the court, without the intervention of a jury, upon such stipulation. It was only intended to conserve to parties in the cases removed to the circuit courts the same right of jury trial which parties possess in cases brought originally in those courts, not to prevent the waiver of a jury by consent. The provision is similar to the one in the Judiciary Act of 1879. 18 Stat. 471; *Kearney* v. *Case*, 12 Wall. 281.

*Judgment affirmed.*