[Sac. No. 3727. In Bank.—February 17, 1927.]

R. B. MOTT, Respondent, v. J. W. CLINE, Appellant.

[1] ALIEN LAND LAW — APPLICATION TO CHINESE — TREATY WITH CHINA.—The Alien Land Law of this state (Stats. 1913, p. 206; Stats. 1921, p. lxxxiii), is applicable to subjects of China, and it does not violate any treaty agreement between the United States and that nation.

[2] ID. — CONSTRUCTION OF UNITED STATES-CHINESE TREATY. — The existing treaty between the United States and China does not guarantee to Chinese subjects the right to acquire, enjoy, or occupy agricultural lands; and the rights, privileges, and immunities accorded to them are such only as are specified by the treaty, to wit: personal security and protection in their property rights against spoliation.

[3] ID.—CONVENTION COVENANT OF 1894—CONSTRUCTION.—The convention covenant of 1894 (28 U. S. Stats. at Large, p. 1210) between the United States and China, prohibiting the immigration of Chinese for a certain period and providing that those then in the United States under the treaty of 1881 should have for the protection of their persons and property all rights accorded citizens of the most-favored nation, excepting the right to become naturalized citizens, did not confer the right to acquire real property upon such Chinese.

[4] ID.—RIGHT TO CARRY ON TRADE — RIGHT TO OWN OR LEASE HOUSES—AGRICULTURAL LAND.—The right to carry on trade or to own or lease and occupy houses, manufactories, warehouses, and shops, or to lease land for residential and commercial purposes, or to do anything necessary for trade, cannot be said to include

the right to own or lease, or to have any title to, or interest in, land for agricultural purposes.

[5] ID.—CONSTITUTIONAL LAW.—The Alien Land Acts of this state are not repugnant to any article of the federal or state constitutions.

[6] ID.—RETROACTIVE EFFECT OF STATUTE—INTENT OF LEGISLATURE—POLICE POWER—OPTION TO PURCHASE LAND.—Whether the Alien Land Acts are retroactive, so far as an option to purchase land executed before the passage of the acts is concerned, depends upon the legislative intent and whether the objects sought to be attained are within the police power of the state; and while there is no direct language in the acts on this point, the general language implies an intention to prevent an executory contract from ripening into a fee simple.

[7] ID.—NATURE AND SCOPE OF POLICE POWER.—The police power of the state, being in its nature a continuous one, must ever be reposed somewhere, and cannot be barred or suspended by contract or irrepealable law; and it is to be presumed that parties contract in contemplation of the inherent right of the state to exercise the police power that the sovereign always reserves to itself for the protection of peace, safety, health, and morals, and its effect cannot be nullified in advance by making contracts inconsistent with its enforcement.

[8] ID.—EXERCISE OF POLICE POWER—ALIEN LAND ACTS.—The adoption of the Alien Land Acts by this state was a lawful exercise of the police power, as ownership of the soil by persons morally bound by obligations of citizenship is vital to the political existence of the state.

[9] ID. — CONSTRUCTION OF ACT. — Conspiring to effect a transfer of real property or an interest therein, in violation of the Alien Land Law, which section 10 of the Act of 1920 makes a crime punishable as a misdemeanor or felony, is the only act that is made a public offense and penalized by imprisonment or fine, or by both, the exaction imposed for all other violations of the act inhibiting transfers being that the conveyance is rendered void as to the state and the real property escheats to the state upon action brought by the attorney-general or district attorney of the county in which the violation occurs.

[10] ID.—OPTION TO PURCHASE LAND — EXECUTION BEFORE PASSAGE OF ALIEN LAND LAW—ABSENCE OF CONSPIRACY.—Where a lease of agricultural land, containing an option to purchase in favor of a Chinese who is ineligible to citizenship, was made prior to the adoption of the Alien Land Laws of this state, the assignment of said option after the passage of such laws to one eligible to exercise all the rights and privileges of citizenship and the exercise of the option by such person does not violate the conspiracy provisions of said law, for under statutes forbidding ownership of land by aliens an alien grantee takes a defeasible estate free

from attack by anyone except the government in escheat proceedings, and if said alien before the power of the state is invoked in an escheat proceeding conveys the property to a person eligible to hold it the infirmity of title is removed.

[11] ID.—ASSIGNABILITY OF OPTION.—An option to purchase agricultural land contained in a lease of such land, where the contract contains no features of personal trust or confidence reposed in any of the parties and requires nothing more than a mere routine of paying money, is assignable, and the option provision is severable from all other provisions of the lease.

[12] ID.—SPECIFIC PERFORMANCE—TENDER OF RENT — INSUFFICIENCY OF—SECTION 1935, CIVIL CODE.—Under section 1935 of the Civil Code, where the holder of an option to purchase contained in a lease exercises the option between rent days a proportionate amount of rent must be tendered for the period of occupancy before exercise of the option or specific performance will not be decreed.

[13] ID.—WAIVER OF OBJECTION TO TENDER—BURDEN OF PROOF.—The burden is on the party asserting a waiver of objection to a tender to prove the same.

---

(1) 2 **C. J.**, p. 1049, n. 58, p. 1050, n. 65, p. 1052, n. 83, p. 1054, n. 92.   (2) 2 **C. J.**, p. 1047, n. 50; 38 **Cyc.**, p. 970, n. 4, 9, 10, 11. (3) 2 **C. J.**, p. 1048, n. 57.   (4) 2 **C. J.**, p. 1049, n. 60.   (5) 2 **C. J.**, p. 1049, n. 58; 12 **C. J.**, p. 928, n. 5 New.   (6) 2 **C. J.**, p. 1050, n. 66.   (7) 12 **C. J.**, p. 904, n. 89, p. 908, n. 21 New, p. 909, n. 32, p. 912, n. 57, p. 991, n. 66, p. 992, n. 70, 71.   (8) 2 **C. J.**, p. 1049, n. 58.   (9) 2 **C. J.**, p. 1051, n. 81.   (10) 2 **C. J.**, p. 1050, n. 65, p. 1052, n. 82, p. 1053, n. 86.   (11) 5 **C. J.**, p. 852, n. 36, 37; 39 **Cyc.**, p. 1245, n. 44, p. 1665, n. 33.   (12) 36 **Cyc.**, p. 703, n. 12. (13) 36 **Cyc.**, p. 703, n. 12, p. 706, n. 24 New; 39 **Cyc.**, p. 1248, n. 56; 40 **Cyc.**, p. 269, n. 47.

APPEAL from a judgment of the Superior Court of Madera County. Stanley Murray, Judge. Reversed.

The facts are stated in the opinion of the court.

Conley, Conley & Conley, Geary & Geary, Lindsay & Conley, Harry I. Maxim and John J. Coghlan for Appellant.

---

11. Right to assign option to purchase, notes, **Ann. Cas.** 1914B, 1228; 43 **L. R. A. (N. S.)** 115.

12. Specific performance of options, note, 118 **Am. St. Rep.** 592.

A. B. Bianchi, Manson & Allan and Albert H. Elliott, *Amici Curiae*, for Appellant.

Walter H. Linforth, John L. McVey and Edwin V. Mc-Kenzie for Respondent.

Nutter, Hancock & Rutherford and A. P. Hayne, *Amici Curiae*, for Respondent.

SEAWELL, J.—This action was brought by the assignee of a lessee who was also the holder of an option against the owner and lessor of the let premises to compel specific performance of the option provision contained in the lease providing for the purchase by said lessee of the demised premises at any time during the term of the lease. Said assignee, who relies solely upon the assignment of the option to purchase, made a tender between rent days of the purchase price as agreed upon by the owner and lessee and demanded the execution and delivery to him of a deed of the demised lands. The owner and lessor refused to comply with the demand to convey. The answer raised the question of the sufficiency of the tender. Judgment went for the plaintiff (assignee), hence this appeal.

The lands in suit are agricultural lands and are situate in the county of Madera, this state. On January 13, 1913, appellant, owner and lessor of said lands, entered into a written contract of lease with Ah Chue, a person of Mongolian blood and a subject of the Empire of China, and alleged to be within the inhibitory provisions of Statutes 1913, page 206, and other subsequent Alien Land Acts, all of which were adopted subsequent to the execution of the lease contract containing the option to purchase, the assignability of which is challenged.

The term of said lease was for a period of ten years, commencing February 1, 1914, almost one year after its execution, at an annual rental of $200 for the first two years and $250 a year for the remainder of the term, payments to be made on the twentieth day of December of each year, commencing with December 20, 1914. By the provisions of said lease all improvements placed on the demised premises by either party were to belong to the lessor,

and if the lessee should be in default at any time in the payment of rent or in the performance of any other covenant of the lease the lessor reserved the right to terminate the lease and retake possession of the premises. The option provision is contained in the following paragraph of the lease:

"And the said party of the first part, his heirs and assigns, does hereby covenant and agree, that the said party of the second part, or his legal representatives, paying the rental herein provided for, and keeping and performing the several covenants herein provided for, shall at all times during the full term of this lease have, hold and fully enjoy the said premises with its appurtenances without let or hindrance of or by the said party of the first part, his heirs or assigns, or any other person whomsoever. First party agrees to sell said premises at any time during the term hereof to said second party for the sum of $4100."

The lessee, on February 1, 1914, went into possession and cleared some thirty acres of land during his tenancy and paid all installments of rent except the installment payable on December 20, 1923, which was not due at the time the complaint was filed, to wit, June 18, 1923. On May 26, 1923, said Ah Chue executed the following instrument:

"I, Ah Chue, . . . do hereby sell, assign, transfer, set over, grant, bargain, sell, convey and confirm unto R. B. Mott . . . all of my right and option to purchase said real property set forth in said lease wherein it is provided that the said J. W. Cline 'agrees to sell said premises at any time during the term' of said lease 'for the sum of $4100.' It is intended hereby to subrogate the said R. B. Mott to every interest which I have in the said option included in said lease and to grant and assign the said option to the said R. B. Mott."

No claim is made that the leasehold was assigned, and no attempt was made to put respondent in possession as a subtenant. The lessee, in fact, continued in possession of the premises under the lease. By a separate paper Mott and Ah Chue agreed as follows:

"I will, as soon as delivery of a conveyance thereof is made by the said Cline, endeavor to sell said property at a profit and in the event of a sale will pay over to you

[Ah Chue] one-half of my profit on such sale. It is understood that you are to consent to a cancellation of your lease of such property to any such purchaser, should such purchaser desire such cancellation . . . All expenses to be paid by R. B. Mott.''

On May 28, 1923, Mott served notice upon appellant Cline of the assignment of said option and made a tender to him of the sum of $4,100 and demanded a conveyance of said premises. The grounds of Cline's refusal, if any were stated, do not appear in the record. The points that the rentals were not fair and reasonable, and that $4,100 was not the fair and reasonable market value of the lands at the time the lease and contract were executed are' not tenable. It was stipulated at the trial that $6,700 was then the fair market value of the premises.

The lease contract was executed before the passage of any of the inhibitory Alien Land Acts subsequently adopted by this state and before there was any law interdicting the ownership of land or any interest therein by any class of aliens. The alienage of Ah Chue was put in issue by the answer and it is the contention of appellant that the option provision is in violation of the 1913 act, *supra*, and the initiative Alien Land Act of 1920 (Stats. 1921, p. lxxxiii) enacted pursuant to the police power of the state and is therefore void. This being so, it is further argued, the option was neither assignable by Ah Chue nor enforceable against him. It is further contended that the lease contract is not severable or divisible on equitable grounds and to so hold would tend to impair the rights of the lessor to the rentals reserved, as the title would be transferred out of the lessor. It is also made grounds of complaint that Ah Chue occupied the premises for a period of about four months immediately prior to the assignment of the option, for which period he paid no rent to the lessor and none has since been paid or tendered for such occupancy by him or anyone in his behalf. His occupancy seems to have continued undisturbed after the execution of the assignment. Aside from the assignability of the option, the sufficiency of the tender and a few questions of pleading, the case is one hinging largely upon the application of the police power of the state and the construction to be given the statutes germane to the subject.

Laws affecting the status of aliens in California are not of recent origin. Long prior to the adoption of laws declaring certain races ineligible to own real property in this state, the constitution provided that no native of China was eligible to citizenship. By article II, section 1 of the constitution of 1879, it was provided that every native male citizen of the United States who should have acquired the right of citizenship by virtue of the treaty of Querataro, and every male naturalized citizen thereof who should have become such ninety days prior to any election, of the age of twenty-one years, and who should have resided within the state, county, and precinct for the periods of time therein prescribed, should be entitled to vote at all elections held therein, provided further that "no native of China shall ever exercise the privileges of an elector." The above provision prescribing ineligibility has never been removed from our constitution. By the statute of 1913 it is provided that all aliens eligible to citizenship under the laws of the United States may acquire, possess, enjoy, transmit, and inherit real property, or any interest therein, in this state in the same manner and to the same extent as citizens of the United States, except as otherwise provided. It is further provided that all aliens not eligible to citizenship may acquire, possess, enjoy, and transfer real property, or any interest therein, in this state in the manner and to the extent and for the purposes prescribed by any treaty then existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise, and in addition thereto lease lands in this state for agricultural purposes for a term not exceeding three years. If in any probate proceeding it should appear that any heir or devisee is barred by reason of the provisions of the act to take real property which said heir or devisee would have been entitled to take, but for the provision of said act, the court, instead of ordering distribution of such real property to said heir or devisee, shall order a sale thereof and the proceeds thereof shall be distributed to said heir or devisee in lieu of said real property. Any real property thereafter acquired in fee in violation of the provisions of the act shall escheat to the state of California upon a proceeding instituted by the attorney-general as by the act provided. The provisions

of the act do not apply to any real property acquired after its passage in the enforcement of any lien or in the satisfaction of any lien existing upon said real property at the time of the adoption of the statute so long as such real property remains the property of the alien acquiring the same by the enforcement of his lien. Any leasehold or other interest in real property less than the fee acquired in violation of the provisions of the act shall escheat to the state. It was but a short time before the act of 1913 became a law that the lease contract was executed. In fact, it was executed during a time when there was much public discussion in the state as to the wisdom of the passage of Alien Land Laws. The term of the lease did not commence until some months after the act of 1913 became effective.

[1] The applicability of the Alien Land Laws to subjects of China is challenged by respondent herein. We have not been cited to nor have we found any state or federal decision construing the Alien Land Laws with respect to the treaty with China. [2] It is contended that while the Alien Land Laws of the state do not violate any treaty agreement between the United States and the Empire of Japan, a different situation exists as to subjects of China by force of the language used in the treaty agreement with that power, it being different in phraseology from the treaty agreement with Japan. It is argued that by the provisions of articles II and III of the existing treaty between the two nations, proclaimed October 5, 1881 (22 U. S. Stats. at Large, p. 826), subjects of China cannot be brought within the inhibitory provisions of the Alien Land Laws of the state without effecting a violation of our treaty agreement. This argument is based mainly upon the clauses of said articles II and III, which accord to Chinese subjects, as therein classified, the rights, privileges, immunities, and exemptions which are accorded to "the citizens and subjects of the most-favored nation." Said articles in their order read:

"Article II.

"Chinese subjects, whether proceeding to the United States as teachers, students, merchants or from curiosity . . . , and Chinese laborers who are *now in the United States* shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privi-

leges, immunities and exemptions which are accorded to citizens and subjects of the most favored nation. (Italics supplied.)

"Article III.

"If Chinese laborers, or Chinese of any other class, *now either permanently or temporarily residing* in the territory of the United States, meet with ill treatment at the hands of any other persons, the Government of the United States will exert all its power to devise measures for their protection and to secure to them the same rights, privileges, immunities and exemptions as may be enjoyed by the citizens or subjects of the most favored nation, *and to which they are entitled by treaty.*" (Italics supplied.)

A supplemental treaty concerning commercial intercourse and judicial procedure was ratified July 19, 1881 (22 U. S. Stats. at Large, 828), by the two nations, but it guarantees no rights to the subjects of China to own or occupy real property. The riotous conditions that existed in some of the states of the Pacific slope as a protest against Chinese immigration, which was pouring into this state and other coast states in menacing numbers, are matters of state history, and were considerations inseparably connected with our treaty agreements with China and were the motive of much subsequent legislation. Years prior to the ratification of said treaty the people of the state of California adopted a new constitution (1879), in which it was provided that no native of China could ever thereafter become an elector of this state. The adoption of statutes withholding from the Chinese rights and privileges granted to the subjects of other nations followed. Conflicts involving violence to the person were not infrequent. As residents of this state they were in disfavor. Their testimony in the earlier years of our statehood was not receivable in courts of justice in certain trials and proceedings. It was claimed by their government that they were denied the equal protection of the laws guaranteed by the federal and state constitutions. At the time the treaty of 1881 was adopted they were not generally engaged in agricultural pursuits and were not landholders, but ·mainly contract laborers who had been brought into this country originally by the builders of the great transcontinental railroads to be used as laborers in the construction of said railroads. They settled in districts which

became greatly overpopulated and later engaged in the laundry business or mercantile pursuits. It was not until later that they engaged in the vegetable and garden truck business, or had any contact with the soil as producers for themselves, and there was no threatened menace by reason of their ownership of or dominion over the agricultural lands of the state until a much later period. The proclamation and preamble of the treaty very clearly show that it was meant as a purely immigration and labor treaty, and it must be construed with respect to the situation that existed at the time it was ratified and the difficulties sought to be corrected as shown by the treaty itself and by modifications that were agreed upon in supplemental treaties. The proclamation declares it to be a treaty for the modification of existing treaties between the two nations "by providing for the future regulation of Chinese immigration into the United States." The preamble, which is declaratory of the motive and object of the treaty, provides: "Whereas the Government of the United States, because of the constantly increasing immigration of Chinese laborers to the territory of the United States, and the embarrassments consequent upon such immigration, now desires to negotiate a modification of the existing treaties," etc. At this time Chinese subjects were expressly forever denied the privileges of citizenship and, as they claimed, the equal protection of the laws. The rights, privileges, and immunities accorded them by treaty were such only as were specified by the treaty, to wit, personal security and protection in their property rights against spoliation. The treaty is no more than it purports to be, and, aside from extending certain privileges and immunities to students, travelers, and other persons who were temporarily within our territory, was intended primarily for the protection of alien Chinese laborers. No rights as to the acquirement, enjoyment, or occupancy of agricultural lands were granted by the treaty. That subject was not germane to the purposes of the treaty. The subsequent exclusion of Chinese immigration into this country was foreshadowed by the proclamation of the treaty and eligibility as owners of the soil finds not the slightest guaranty in either the spirit or language of the treaty. Any other conclusion would be repugnant to the conditions that were terminated by the treaty agreement.

[3] In 1894, "in view of the antagonism and much deprecated and serious disorders to which the presence of Chinese laborers has given rise in certain parts of the United States," the governments of China and the United States, by a convention covenant (28 U. S. Stats. at Large, p. 1210), agreed upon articles whereby it was provided that the coming, except under conditions not affecting the decision of the question before us, of Chinese to the United States should be absolutely prohibited for a period of ten years, and said agreement should continue for another like period unless either government should at the expiration of the first ten-year period give formal notice to the other of its termination. Said articles further provided that Chinese then in the United States under the treaty of 1881, "shall have for the protection of their persons and property all rights that are given by the laws of the United States to citizens of the most favored nation, excepting the right to become naturalized citizens." No right to acquire real property is conferred thereby. By consenting to the ineligibility of its subjects to become citizens, China also conceded the right of the United States to define or fix the status of its subjects as to the acquisition of agricultural lands. The "most-favored nation" clause is not used in a sense materially different from the language used in our treaty with Japan, entered into in 1911, which treaty has been construed as not giving to the subjects of that empire any right to own or lease agricultural land. [4] The right to carry on trade or to own or lease and occupy houses, manufactories, warehouses, and shops, or to lease land for residential and commercial purposes, or to do anything necessary for trade, cannot be said to include the right to own or lease, or to have any title to, or interest in, land for agricultural purposes. (*Terrace* v. *Thompson,* 263 U. S. 197 [68 L. Ed. 255, 44 Sup. Ct. Rep. 15], and cases therein cited; *Webb* v. *O'Brien,* 263 U. S. 313 [68 L. Ed. 318, 44 Sup. Ct. Rep. 112]; *Porterfield* v. *Webb,* 195 Cal. 71 [231 Pac. 554].) It may well be said here, as was said in *Webb* v. *O'Brien, supra,* construing the treaty with Japan, "The treaty gives no permission to enjoy, use or have the benefit of land for agricultural purposes. The privileges granted by the act are carefully limited to those prescribed in the treaty. The act as a whole evidences

a legislative intention that ineligible aliens shall not be permitted to have or enjoy any privilege in respect of the use or benefit of land for agricultural purposes. And this view is supported by the circumstances and negotiations leading up to the making of the treaty." In addition, it may be said that the interpretation which we have given the treaty has for many years been acquiesced in by the nation affected thereby.

[5] The Alien Land Acts are not repugnant to any article of the federal or state constitutions and do not impinge upon the treaty agreements existing between this nation and China.

We have set forth at some length the history of our treaty agreements and our commercial, industrial, and political relations with China and her subjects, together with the constitutional and statutory regulations bearing upon those subjects, to show that there is no substantial ground upon which a claim may be based that it was the intention of either the state or federal governments to grant to native-born subjects of China the right of acquiring the title to agricultural lands. The spirit and scheme of our state and federal regulations are repugnant to such a claim.

[6] We now come to a consideration of the question whether or not the Alien Land Acts are retroactive so far as the option is concerned. This question depends largely upon the legislative intent and upon whether or not the objects sought to be attained are within the police power of the state. There is no direct language upon this point, but there is general language which necessarily implies an intention to prevent an executory contract from ripening into a fee simple. Section 2 of the act of 1920 provides: "All aliens other than those mentioned in section one of this act may acquire, possess, enjoy and transfer real property, or any interest therein, in this state, in the manner and to the extent and for the purpose prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise." Section 7 provides: "Any real property *hereafter acquired in fee in violation of the provisions of this act* by any alien mentioned in section two of this act, . . . shall escheat to, and become and remain the property of the State of California . . . ''

(Italics supplied.) The treaty confers no right to acquire a fee in agricultural lands. An assumption of rights not granted by the treaty is a violation of the act. It was the purpose of the act to cut off *instanter* the right to thereafter acquire the fee. It is not to be presumed from a consideration of the evil to be remedied that the state so tied its hands as to be utterly helpless and unable to protect itself against the passing of large and fertile acreages of land into the hands of ineligible aliens, who, in anticipation of adverse legislation, should contract with respect to the exercise of an option to purchase said lands. If this were so, the fee of the state's best lands could have been acquired by the persons proscribed between the day the act was introduced in the legislature and the day on which it became effective. Surely sovereignty is not so impotent as to be unable to protect itself from a menacing situation.

[7] "The police power being in its nature a continuous one, must ever be reposed somewhere, and cannot be barred or suspended by contract or irrepealable law. It cannot be bartered away even by express contract." (5 Cal. Jur. 689; *Laurel Hill Cemetery* v. *San Francisco,* 152 Cal. 464 [14 Ann. Cas. 1080, 27 L. R. A. (N. S.) 260, 93 Pac. 70].) It is to be presumed that parties contract in contemplation of the inherent right of the state to exercise unhampered the police power that the sovereign always reserves to itself for the protection of peace, safety, health and morals. Its effect cannot be nullified in advance by making contracts inconsistent with its enforcement. (Freund on Police Power, sec. 556; 5 Cal. Jur. 778; *Louisville & N. R. R.* v. *Mottley,* 219 U. S. 467 [34 L. R. A. (N. S.) 671, 55 L. Ed. 297, 31 Sup. Ct. Rep. 265, see, also, Rose's U S. Notes]; *Philadelphia, B. & W. Ry. Co.* v. *Schubert,* 224 U. S. 603 [56 L. Ed. 911, 32 Sup. Ct. Rep. 589]; *Manigault* v. *Springs,* 199 U. S. 473 [50 L. Ed. 274, 26 Sup. Ct. Rep. 127]; *Pinney & Boyle Co.* v. *Los Angeles Gas & Electric Co.,* 168 Cal. 12 [Ann. Cas. 1915D, 471, L. R. A. 1915C, 282, 141 Pac. 620]; *Kentucky Traction & Terminal Co.* v. *Murray,* 176 Ky. 593 [195 S. W. 1119]; *Raymond Lumber Co.* v. *Raymond L. & W. Co.,* 92 Wash. 330 [L. R. A. 1917C, 574, 159 Pac. 133]; *Massillon Sav. & Loan Co.* v. *Imperial Finance Co.,* 114 Ohio St. 523 [151 N. E. 645];

*Shrader* v. *Steubenville etc. Co.,* 84 W. Va. 1 [99 S. E. 207].) Both Cline, the owner of the land, and Ah Chue, the optionee, entered into the contract charged not only with notice of what the state had the right to do in the exercise of the police power, but also with notice of what it had done by constitutional and statutory laws affecting ineligible persons and what in all probability it was most likely to do under a situation that was becoming acute as to alien ownership of land.

[8] It has been firmly settled by the decisions of both federal and state courts (*Webb* v. *O'Brien, supra; Terrace* v. *Thompson, supra; Porterfield* v. *Webb, supra,* and many others to the same effect) that the adoption of the Alien Land Acts was a lawful exercise of the police power. In fact, it is the exercise of that power in its highest and truest sense. The ownership of the soil by persons morally bound by obligations of citizenship is vital to the political existence of a state. It directly affects its welfare and safety. In *Terrace* v. *Thompson, supra,* the following observation is quoted approvingly: "It is obvious that one who is not a citizen and cannot become one lacks an interest in, and the power to effectually work for the welfare of the state, and, so lacking, the state may rightfully deny him the right to own and lease real estate within its boundaries. If one incapable of citizenship may lease or own real estate, it is within the realm of possibility that every foot of land within the state might pass to the ownership or possession of non-citizens." (*Terrace* v. *Thompson,* 274 Fed. 841, 849.) It is further declared by the high authority last cited that "the allegiance of the farmers to the state directly affects its strength."

"At common law, aliens, though not permitted to take land by operation of law, may take by the act of the parties; but they have no capacity to hold against the state, and the land so taken may be escheated to the state." (*Webb* v. *O'Brien, supra; Doe* v. *Robertson,* 11 Wheat. (U. S.) 332 [6 L. Ed. 488, see, also, Rose's U. S. Notes]; *Suwa* v. *Johnson,* 54 Cal. App. 119 [203 Pac. 414].)

[9] It is appellant's view that the option provision has been rendered void by section 10 of the act of 1920, which makes it a crime punishable as a misdemeanor or felony to conspire to effect a transfer of real property or an inter-

est therein in violation of the law. This is the only act that is made a public offense and penalized by imprisonment or fine or by both. (*In re Akado,* 188 Cal. 739 [207 Pac. 245].) The exaction imposed for all other violations of the act inhibiting transfers is that the conveyance is rendered void as to the state and the real property escheats to the state upon action brought by the attorney-general or district attorney of the county in which the violation occurs. (*People* v. *Cockrill,* 268 U. S. 258 [69 L. Ed. 944, 45 Sup. Ct. Rep. 490].) Our statute follows the common law as to the escheat proceedings. **[10]** It cannot be said that Ah Chue violated any provision of the conspiracy section.

The acts are designed to keep agricultural lands in the control of citizens or such persons as are eligible to citizenship under the state and federal laws. The option agreement was entered into at a time when there was, and for a number of years prior thereto had been, a very general public demand for the adoption of laws rendering persons ineligible to citizenship incapable of owning, leasing, or occupying agricultural lands within this state. The act of 1913 was introduced in the legislature as a proposed law about the same day the lease containing the option was signed. It became a law within a few months thereafter, and before the ten-year term, as stipulated in the lease, commenced. Ah Chue occupied the lands nine years and four months before making an assignment of the option. Within this period the initiative act of 1920 was adopted. Had the assignment of the option been made to an ineligible person we would hold that the assignment violated the act of 1920 and consequently a court of equity would not compel specific performance of an act forbidden by law. Likewise we are of the opinion that the ineligible alien could not have compelled a conveyance to himself. (*Ales* v. *Epstein,* 283 Mo. 434 [222 S. W. 1012]; *Case* v. *Kelly,* 133 U. S. 21 [33 L. Ed. 513, 10 Sup. Ct. Rep. 216, see, also, Rose's U. S. Notes]; *Suwa* v. *Johnson, supra.*) The policy of the state forbade it. But here we have quite a different question presented. The ineligible person is not attempting to transfer any right or interest whatsoever to another who is likewise ineligible. The diverted stream is turned back into its legitimate channel. Respondent Mott, who is Ah Chue's assignee, is a person eligible to exercise all the

rights and privileges of citizenship. As a matter of fact, the assignment is in furtherance of the purposes of the law. The fact that Ah Chue may receive a portion of the proceeds of the transaction is not at all material to the question. All of the Alien Land Laws that have been passed provide that if an ineligible alien is an heir or devisee under a will the real property may not be distributed to him, but it must be sold and the proceeds distributed to such ineligible alien. The law does not mean to confiscate property, but to escheat it to the state in cases of violations of the acts in a proceeding brought for that purpose.

It was held in *Suwa* v. *Johnson, supra,* supported by a citation of authority from almost every jurisdiction of the nation, that under statutes forbidding ownership of land by aliens an alien grantee takes a defeasible estate free from attack by anyone except the government in escheat proceedings. (See, also, *Estate of Yano,* 188 Cal. 645, 650 [206 Pac. 995]; *In re Akado,* 188 Cal. 739, 742 [207 Pac. 245]; *Fairfax* v. *Hunter,* 7 Cranch (U. S.), 602 [3 L. Ed. 453]; *Phillips* v. *Moore,* 100 U. S. 208 [25 L. Ed. 603].) It is a governmental affair, a transfer made in violation of the act being defeasible as to the state only. It is quite well settled that in case title to real property is defeasible by reason of the alienage of the owner and said owner before the power of the state is invoked in an escheat proceeding conveys the property to a person eligible to hold it, as Mott unquestionably is, the infirmity of title is removed. (*Manuel* v. *Wulff,* 152 U. S. 505 [38 L. Ed. 532, 14 Sup. Ct. Rep. 651]; *State ex rel. Atkinson* v. *World Real Estate Commercial Co.,* 46 Wash. 104 [89 Pac. 471]; *Oregon Mtg. Co., Ltd.,* v. *Carstens,* 16 Wash. 165 [35 L. R. A. 841, 47 Pac. 421]; 2 Cor. Jur. 1053.)

A case quite in point is *State ex rel. Atkinson* v. *World Real Estate Commercial Co. et al., supra.* There an ineligible alien conveyed real property to the World Real Estate Commercial Company in violation of the provisions of the constitution of the state of Washington. The court, in passing upon an objection similar to the one made here, held that an alien holding lands in that state by purchase under a defeasible title, subject to attack on the part of the state, might by deed transfer a good title to a third person entitled to receive and hold it, provided no pro-

200 Cal.—29

ceeding had theretofore been taken by the state for the purpose of declaring a forfeiture or escheat. Numerous other cases are to the same effect.

[11] It is next contended that the option was nonassignable. Inasmuch as the contract contains no features of personal trust or confidence reposed in any of the parties and requires nothing more than a mere routine of paying money, it is assignable. (25 Cal. Jur. 509; 5 Cor. Jur. 852; *Prichard* v. *Kimball*, 190 Cal. 757 [214 Pac. 863.].) The option provision is clearly severable from all other provisions of the lease and no injury could possibly come to the owner and lessor by receiving the cash purchase price, to wit, $4,100, from the optionee's assignee, rather than from the optionee. No features of trust or confidence, as pointed out in *Prichard* v. *Kimball, supra,* exist in the instant case. Under the laws of this state "property of any kind may be transferred, except as otherwise provided by this article [Article 2 of Div. 2, Pt. 4, Tit. 4, Ch. 1, Civil Code]." (Civ. Code, sec. 1044.) The assignability of an option in the exercise of a general property right is not made an exception to the general rule by any code provision.

[12] But we are of the opinion that respondent cannot prevail because of his failure to make a proper and seasonable tender. It is admitted that the only tender made by respondent was the amount stated in the option, to wit, $4,100. In other words, no proportionate amount of rent was tendered by either the lessee or his assignee for the use of the premises for a period of about four months, or one-third of the year 1923. "When the hiring of a thing is terminated before the time originally agreed upon, the hirer must pay the due proportion of the hire for such use as he has actually made of the thing, unless such use is merely nominal, and of no benefit to him." (Civ. Code, sec. 1935.) That the section of the code above cited has direct application to the instant case, there can be no doubt. (*Diepenbrock* v. *Luiz,* 159 Cal. 716 [Ann. Cas. 1912C, 1084, L. R. A. 1915C, 234, 115 Pac. 743].) Resolving all other controverted questions of law in favor of respondent, the failure to tender a proportionate amount of rent for the use made of the premises by the lessee for a period of about four months prior to the offer to purchase furnishes a complete bar and answer to his demand for specific per-

formance of the option provision. Section 1935 of the
Civil Code is an innovation upon the common-law rule,
which was to the effect that rent will not be apportioned in
case of the termination of the lease before the rent is due.
A number of the states of the Union have, however, adopted
statutes similar to ours with reference to the apportionment
of rent.

[13] Respondent further contends ·that appellant, Cline,
by a failure to object to the insufficient amount of the
tender must be deemed to have waived any objection
he might have made on that ground. (Sec. 2076, Code
Civ. Proc.; sec. 1501, Civ. Code.) An examination of the
record, however, does not show that respondent sought to
introduce any evidence of such waiver. The record is silent
as to what actually took place when the insufficient tender
was made. The burden is on the party asserting a waiver
to introduce evidence of the facts constituting it (25 Cal.
Jur. 932; 40 Cyc. 269), and respondent did not meet this
burden. If Cline, in fact, waived the insufficiency of the
tender, respondent had the right to seek from a court of
equity a decree of specific performance directing a con-
veyance to him upon payment of the stipulated purchase
price and the proportionate amount of rent due. (*Brad-
ford* v. *Fidelity Sav. & Loan Society,* 177 Cal. 247 [170
Cal. 404]; *Hixson* v. *Hovey,* 18 Cal. App. 230 [122 Pac.
1097]; *Colton* v. *Oakland Bank of Savings,* 137 Cal. 376
[70 Pac. 225]; *Shermaster* v. *California Bldg. etc. Co.,*
40 Cal. App. 661 [181 Pac. 409].) If Cline did not waive
the insufficiency of the tender, respondent lost all rights
under the option, and cannot be given the relief sought by
a modification of the judgment of the trial court or in any
other manner. The offer by its very terms was to continue
only during the life of the lease, and since the insufficient
tender of $4,100, in the absence of circumstances establishing
a waiver, did not constitute an acceptance, the effect of
holding that respondent now has the right to compel
specific performance would be to extend the option beyond
the time when it was to terminate by the express agreement
of the parties.

Questions going to the sufficiency of the evidence and the
findings and questions of pleading, more or less of a techni-

cal character, may easily be overcome by amendment and production of evidence.

The judgment is reversed.

Richards, J., Shenk, J., Waste, C. J., Curtis, J., Preston, J., and Langdon, J., concurred.

Rehearing denied.