[Sac. No. 4647. In Bank.—August 22, 1933.]

ROBERT MORRIS HART, Appellant, v. KANAYE NAGASAWA, Respondent.

John L. Schaefer for Appellant.

Wallace L. Ware and George W. Murphy for Respondent.

THE COURT.—This action was brought by plaintiff to have it determined that he is the owner of a joint life estate in certain real property in Sonoma County, and to quiet his title thereto. The answer of defendant denies the existence of any interest in plaintiff, alleges the entire fee is in defendant, and, in addition, sets up as an additional defense

the statute of limitations, and alleges that plaintiff conveyed all his interest in the property to defendant in 1919.

The real property involved is a ranch called by the parties and hereinafter referred to as Fountain Grove. Both appellant and respondent claim through a deed from Thomas L. Harris and Jane L. Waring Harris. This deed was executed and delivered to the grantees therein named in the year 1900. The main controversy in this case is over the proper interpretation of that deed, and over the nature of the estate conveyed to the grantees thereby.

The granting and *habendum* clauses of the deed read as follows:

"The said parties of the first part [Mr. and Mrs. Harris] for and in consideration of the sum of forty thousand dollars ($40,000.00) . . . have granted, bargained, and sold, conveyed and confirmed, and by these presents do grant, bargain and sell, convey and confirm unto the said parties of the second part [Kanaye Nagasawa, Miss Eusardia Nicholas, Miss Margaret Edith Parting, Robert Morris Hart, appellant, and Mary Elizabeth Hart, his wife] and to their heirs and assigns forever [here follows a legal description of the lands included within Fountain Grove] . . . To have and to hold, all and singular, the said lands and premises . . . unto the said parties of the second part, in joint tenancy, with full and absolute title to his or her, the last survivor of the said parties of the second part, and to the longest liver of the said parties of the second part, and to his or her heirs, administrators or assigns forever."

Although it is admitted that the forty thousand dollars consideration named in the Harris deed never actually passed, it is likewise admitted that the deed was amply supported by other consideration, and was legally sufficient to convey to the grantees the estate therein mentioned.

In 1903, Miss Nicholas, one of the grantees, died. In 1911 Miss Parting, another of the grantees, executed and delivered to respondent a grant, bargain and sale deed conveying to respondent all of her right, title and interest in the premises affected by this action. Miss Parting has since died. In 1919 appellant and his wife executed and delivered a quitclaim deed to respondent of all of their right, title and interest in and to Fountain Grove. Mrs. Hart has

since died, so that appellant and respondent are the only living grantees named in the Harris deed.

Appellant contends that the 1919 quitclaim deed executed by him was not supported by consideration, and was secured from him by undue influence and duress exercised by respondent. The main contention of appellant is that the Harris deed did not convey the fee simple title to Fountain Grove to the grantees in joint tenancy, but conveyed a joint life estate with contingent remainder to the survivor and his or her heirs. It is therefore contended that if appellant is correct in his interpretation of the Harris deed, even if the quitclaim deed of 1919 was valid, all that was conveyed thereby was the life interest of the Harts. If these contentions were correct appellant would still have an interest in the property in the nature of a contingent remainder. Respondent contends that the Harris deed conveyed the fee title in joint tenancy to the five grantees, and that since all of the other grantees have either died or deeded their respective interests to him, he is now the sole owner in fee simple. The trial court interpreted the Harris deed as does respondent, and determined the issues of consideration, undue influence and duress in his favor.

▮ We have no hesitancy in holding that the Harris deed conveyed the fee in joint tenancy. The granting clause purports to convey the fee-simple title to the five grantees without limitation. The *habendum* clause simply defines the estate granted as a joint tenancy, with right of survivorship. The language "with full and absolute title to his or her, the last survivor of said parties of the second part, and to the longest liver of the said parties of the second part, and to his or her heirs, administrators or assigns forever" is merely descriptive of one of the chief incidents of a joint tenancy, i. e., the right of survivorship. We can read nothing in that language but a rather inapt and unhappy statement that the grantees are to hold as joint tenants, with fee to the survivor. Out of an abundance of caution the scrivener then described the survivor as the "longest liver of the said parties of the second part". Everything that follows the words "in joint tenancy" in the *habendum* clause simply is an express provision for what would otherwise be implied from the use of the words "joint tenancy", that is, the right of survivorship.

■ It is true, of course, that the purpose of the *habendum* clause in a deed is to limit, enlarge and define the estate indicated in the granting clause, and that if the granting clause refers to a fee and the *habendum* to a lesser estate, only the latter will be conveyed. (*Barnett* v. *Barnett*, 104 Cal. 298 [37 Pac. 1049]; *Anderson* v. *Yoakum*, 94 Cal. 227 [29 Pac. 500, 28 Am. St. Rep. 121].) Applying that rule to the present case, the granting clause purports to grant the property to the five grantees in fee, and the *habendum* simply describes their estate as one in joint tenancy. Giving the words used their ordinary and usual meaning, they can be interpreted but one way—that is they create a joint tenancy, with the right of survivorship expressly provided for. ■ The estate contended for by appellant—a joint life estate with contingent remainder to the survivor, is of such an unusual nature that before a court would be justified in holding such an estate had been created, clear and unambiguous language to that effect would have to be used. Here there is no ambiguity or uncertainty in the words used. Nowhere in the deed did the grantors purport to be retaining or reserving any estate in themselves; nowhere in the deed is there any reference directly or indirectly to an estate in remainder; nowhere in the deed is there any reference at all to a life estate. Although not perhaps conclusive, these factors are of some importance in construing the words used. Another factor should be mentioned. Section 1105 of the Civil Code provides, "A fee simple title is presumed to be intended to pass by a grant of real property, unless it appears from the grant that a lesser estate was intended." Nowhere in the deed here involved is there any reference to any such lesser estate, and so we must presume a fee was intended to pass.

The trial court admitted considerable evidence as to the relationship between the grantors and grantees, and the circumstances under which the deed was executed. Nothing appears therefrom which directly or indirectly discloses any intent on the part of the grantors to create other than a fee simple in joint tenancy.

Authorities are not lacking to the effect that the language used in the present deed creates a joint tenancy in the fee. In *Swan* v. *Walden*, 156 Cal. 195 [103 Pac. 931, 932, 134 Am. St. Rep. 118, 20 Ann. Cas. 194], the interpretation of

two deeds was involved. The first of these read "To Edward Walden and Louella Walden . . . *as joint tenants with fee to the survivor."* The second deed read to the same parties "during their joint lives, *as joint tenants, and afterwards to the survivor in fee simple absolute.* . . . The intention of this grant being to constitute a joint tenancy in said land. . . . " It is to be noted that the language of both deeds is as capable of the interpretation that a joint life estate with remainder to the survivor was intended as is the deed in the instant case, and yet the court properly held a joint tenancy in the fee was created. In *Hilborn* v. *Soale,* 44 Cal. App. 115 [185 Pac. 982], the grantors conveyed to two grantees "as joint tenants, *with the right of survivorship* . . . to have and to hold to the said grantees *and to the survivor or* [*of*] *them forever".* It was contended that this deed created a joint life estate with remainder to the survivor. The language used by the District Court of Appeal in discussing this point is quite appropriate to the case at bar. At page 116 it is stated: "Appellants' contention is based upon the theory that the words in the deed, italicized herein for the purposes of this case, are effective to prevent the severance of the joint tenancy by execution sale, or voluntary act of either of the parties to the title, and preserve the right of survivorship by creating an independent title in the survivor upon this life estate. Without discussing the question as to whether or not such an estate can be created under the limitations of the California Civil Code, we are satisfied that the language of the instrument, as relied upon by appellants, is not calculated and was not intended to limit or modify the apt language for the creation of a joint tenancy. We see nothing in the words 'with right of survivorship', following the grant to 'Carl B. Soale and Wilson H. Soale, her husband, as joint tenants', other than the expressed declaration of the implied incident of right of survivorship which characterizes a joint tenancy; and the italicized words in the *habendum* clause, 'To have and to hold to the said grantees *and to the survivor of them forever,'* is in nowise inconsistent with the granting clause. Of course, no question of tenancy by entireties, as between husband and wife, is involved in this case under our statutes; and it is apparent under the granting clause, independent of the language in

controversy, that it was the intention of the grantor to create a joint estate. It is not disputed that the *habendum* clause, where such intent is made clear, can be resorted to to restrict, limit or enlarge the estate indicated in the grant; but no such purpose is indicated here. In *Barnett* v. *Barnett,* 104 Cal. 298 [37 Pac. 1049], and *Jacobs* v. *All Persons, etc.,* 12 Cal. App. 163 [106 Pac. 896], cited by appellants, the *habendum* clause under consideration in each instance in expressed terms limited the estate vested in the grantee named to a life interest.

''Without reviewing appellants' citations from the courts of other states, we find them all distinguishable from the case at issue here, and for the most part concerned with the construction of deeds in which the *habendum* clause is in irreconcilable conflict with the granting clause. Such is not the condition here. In *Swan* v. *Walden,* 156 Cal. 195 [134 Am. St. Rep. 118, 20 Ann. Cas. 194, 103 Pac. 931], in which case the deeds in question more nearly correspond to the deed under consideration here than in any of the foreign cases cited, our Supreme Court held that a conveyance to grantees, husband and wife, 'as joint tenants, with fee to the survivor', and another to grantees as husband and wife 'during their joint lives', and afterward to the survivor in fee simple absolute, vested the estate in these grantees in joint tenancy. We reach the same conclusion in this case.''

We find nothing contrary to these views in *Montgomery* v. *Sturdivant,* 41 Cal. 290. There the deed expressly provided for a *life estate* and *remainder* to the heirs of the bodies of the grantees. The court properly held that giving the words used full effect ''it is a conveyance to the grantees for their joint lives . . . with remainder to the issue and heirs of their two bodies''. In the instant case giving the words used their full effect a joint tenancy with right of survivorship was provided for.

Nothing more need be said on this phase of the case. We therefore hold that the Harris deed was intended to and did vest in the five grantees as joint tenants the fee-simple title to Fountain Grove. Upon the death of Miss Nicholas in 1903 the fee was then vested in the four survivors. In 1911 Miss Parting conveyed to respondent her interest in the property. ▮ Then in 1919 appellant and his wife quit-claimed their interest in the property to respondent. Ob-

viously if this last-mentioned deed was valid respondent then became the owner in fee of Fountain Grove. Appellant contends, however, that the 1919 deed was invalid for the reason that it was unsupported by consideration and was secured by respondent by the use of undue influence and duress. In order to discuss this contention the background of the relationship between the various parties must be briefly referred to.

Respondent, Nagasawa, first met Mr. Harris in 1867 in London. He came to the United States in that year and renewed his friendship with Mr. Harris, who had preceded him to this country. In 1875 he accompanied Mr. and Mrs. Harris to California. Harris purchased the property which is the subject of this suit, and from that time on Nagasawa managed and supervised it. Harris was widely known for his religious and philosophical teaching and writings. He organized a group, of which the five grantees in the Harris deed were the nucleus, who were interested in living according to the precepts taught by Harris. Miss Nicholas and Miss Parting came to live at Fountain Grove in 1885 or 1886, and contributed various sums of money to Harris in order that he could carry on his teachings. Evidently the profits from the sale of the products of Fountain Grove were largely used for the same purpose. Mrs. Hart, then unmarried, came to live at Fountain Grove in 1886, and Mr. Hart came shortly thereafter. The Harts were married at the ranch in 1887. The Harts left Fountain Grove in 1892 and went to New York to work for Harris at a depot from which the products of the ranch were sold and distributed. Under the personality and leadership of Harris the five grantees were very friendly to each other, and all contributed either money or services to the enterprise. Harris went to New York in 1900 and left Nagasawa in charge of Fountain Grove. He then caused his attorney, A. B. Ware, to prepare and deliver the deed granting the land to his five faithful workers. After this deed had been delivered Harris still remained closely in touch with Fountain Grove, and continued his religious and philosophical teaching and writing. Through 58 Vesey Street, New York, the distributing depot for the products of Fountain Grove, he continued to receive large sums of money for living expenses and for carrying on his life work. The evidence

shows that between 1892 and 1906, when he died. Harris received about $110,000 from Vesey Street, over $30,000 of which was advanced after 1900. The money so received, together with contributions from other sources, was kept by Harris as a so-called trust fund. Upon the death of Mr. Harris the residue of this fund passed to his wife, who thereafter made her home with the Harts. The Harts and Mrs. Harris came to Fountain Grove in 1909. Apparently the Harts and Nagasawa could not agree as to the proper management of Fountain Grove, and so the Harts and Mrs. Harris moved to San Diego, where Mrs. Harris died in 1916. It should also be mentioned that since 1909 Nagasawa has paid all taxes and expenses; and has assumed all obligations connected with Fountain Grove.

At the time the action was commenced the defendant had resided upon the premises for a period of more than fifty-five years, and it was almost solely through his management and supervision that the vineyards were planted and the products of the vineyards were manufactured into wines, tonics and grape-juice beverages. His interest antedates the passage of the Alien Land Act by many years. He had been in the sole and absolute possession of said premises for many years before the passage of the Alien Land Act. In fact his right of possession has never been questioned by plaintiff or by anyone else. A bonded winery upon the premises has been in operation for a number of years. Since 1919 defendant has procured from the United States government various permits authorizing him to sell wines and wine tonics under his name. He has made leases of portions of the said premises for gas station and airport purposes, sold a portion to the state for highway purposes, and in 1927 or 1928 executed to the Bank of Italy of Santa Rosa a mortgage as security for a considerable sum of money which he borrowed from said bank. His right of occupancy or dominion had never been questioned until the filing of this belated action.

Upon the death of Mrs. Harris in 1916 the Harts took over the management of the so-called trust fund. In 1919 Nagasawa had some discussion with the Harts about the trust fund. He finally wrote to the Harts pointing out that possibly he had some claim to the trust fund and suggested an accounting. He stated that unless such an accounting

694

was had he would see an attorney and be advised. As already pointed out a large portion of the money in the trust fund had originally come from the sale of the products of Fountain Grove. The Harts were evidently perturbed over the possibility of having to account for the so-called trust fund, and over the possibility that they or the fund might be called upon to meet some of the obligations of Fountain Grove. They agreed to negotiate. Nagasawa appointed one George F. King his attorney-in-fact, and gave him written power to negotiate for him. Eugene Daney, an attorney in San Diego, acted as attorney for both parties. He had been Hart's attorney since 1916. The evidence shows that appellant disclosed the whole situation to Daney and told him that he feared Fountain Grove was in a failing financial condition and might call on the trust fund for assistance. Everyone was apparently quite friendly and satisfied with the deal that was ultimately worked out. The Harts wanted to be relieved of any past or future claims of Fountain Grove on the trust fund. They evidently felt that with the advent of prohibition, Fountain Grove, with its large vineyards, which were its principal support, would go bankrupt. Under these circumstances Mr. and Mrs. Hart signed the quitclaim deed by which they conveyed to Nagasawa all of their right, title and interest in and to Fountain Grove. Nagasawa, as part of the same transaction, and as consideration therefor, on his own behalf and on behalf of the Fountain Grove Vineyard Company, agreed "never to disturb, molest, interfere with, call for an accounting of, or make any claim upon that certain trust fund". The agreement embodied a mutual release of all claims of Nagasawa, past, present and future to the trust fund, and of all claims of the Harts, past, present and future to Fountain Grove. The Harts were released from any liability for past claims growing out of the operation of Fountain Grove. The evidence shows that Hart, after this agreement had been consummated, was very happy in having settled the matter in a way he considered to his advantage. Daney testified that the agreement was the result of the mutual understanding and desire of all concerned. The evidence shows that in 1921 Hart told Freeman, a partner of Nagasawa, in New York, that he, Hart, was "entirely satisfied with the deal I drove with Kanaye Nagasawa, and I am relieved to know

that from now on I won't be called upon to contribute to the support and maintenance of Fountain Grove. . . . I realize if I had remained a partner, the money in my hands would have been subjected to withdrawal for Fountain Grove liabilities . . . with the incoming of prohibition I consider that Fountain Grove will fail and go bankrupt." Freeman testified positively to this conversation, and although Hart refused to admit that he had so stated he would not deny that the conversation had taken place. There is some evidence that Hart was so satisfied with the 1919 deal that shortly thereafter he paid King, attorney-in-fact for Nagasawa, some money for "past succor".

From the above facts it sufficiently appears that the contention of appellant that the quitclaim deed was secured by respondent by duress or undue influence is utterly without merit. The record clearly shows that the 1919 agreement was the result of a mutual understanding, and entirely satisfactory to appellant when it was entered into. The evidence further shows that Hart entered into the agreement gladly and of his own free will. It might be added that with the exception of some information contained in a purported copy of a telegram, which was properly excluded from the evidence because no proper foundation was laid for its introduction, Hart admitted that in 1919 he knew every fact concerning the transaction which he knew in February, 1931, at the time of the trial. Appellant's good faith in making the contention at this late date that the agreement was secured by undue influence and duress is open to some doubt. ■ The evidence likewise shows a legal and adequate consideration. The assumption by Nagasawa of all liabilities connected with Fountain Grove, of itself, would be sufficient consideration. The release of all claims to the trust fund was clearly the result of a valid compromise. It is, of course, well settled that the compromise of even a doubtful claim maintained in good faith constitutes a valid and legal consideration. (*Bank of Commerce* v. *Scofield*, 126 Cal. 156 [58 Pac. 451]; *Rohrbacher* v. *Aitken*, 145 Cal. 485 [78 Pac. 1054].)

■ Appellant, without any allegation of ineligibility in the pleadings, rather vaguely points out that the evidence shows that Nagasawa was born in Japan, and inferentially is of Japanese blood, and that under the Alien Property

Act it is unlawful for an incligible alien to own agricultural property in this state. Assuming, but not deciding, that the conveyance by the Harts to Nagasawa in 1919 was in violation of the act, that fact would in no way invalidate the conveyance. The conveyance was fully executed. Title vested in the grantee, and the grantor cannot complain. If the conveyance was in violation of the act, the state of California is the only one who can challenge it. In no event would it revert to appellant. (*Shiba* v. *Chikuda,* 214 Cal. 786 [7 Pac. (2d) 1011]; *Mott* v. *Cline,* 200 Cal. 434 [253 Pac. 718]; *Suwa* v. *Johnson,* 54 Cal. App. 119 [203 Pac. 414].) Surely defendant will not be deprived of his property in violation of the due process of law.

The other points raised by appellant are so unsubstantial as not to require discussion.

We are of the view that the trial court's interpretation of the language of the deed should not be disturbed.

Judgment affirmed.