ELIZABETH L. HUGHES, Appellant, *v.* SARAH E. TECHT, Respondent.

First Department, July 3, 1919.

Aliens — status of citizen woman married to resident alien — rights of aliens whose country is at war with United States — alien friends — section 10 of Real Property Law construed — American woman wife of Austrian subject domiciled in this country as alien friend — right to take real property.

A woman who marries an alien takes, under our Federal statutes, the political status of her husband.

But, while this makes her an alien, it does not necessarily make her an alien enemy.

The trend of recent decisions has been to recognize and enforce the civil rights of citizens of a country with which we are at war, domiciled in this country, and whose laws they have respected and obeyed and who have observed the rules of conduct laid down for their guidance by competent authority.

The usual and customary definition of an alien enemy is a subject of a nation which is at war with this country, while an alien friend is the subject of a nation which is at peace with this country.

But an alien friend within the meaning of section 10 of the Real Property Law, as amended by chapter 152 of the Laws of 1913, is not merely a resident subject of a nation with which we are at peace, but also a resident subject of a nation with which we are at war, who has observed to the letter our laws and regulations laid down for his conduct.

An American-born woman who has married a resident subject of a country (Austria) with which we are at war, but who is a law-abiding resident, is entitled to inherit real property of one dying intestate after war has been declared between this country and the country of her husband's nativity.

APPEAL by the plaintiff, Elizabeth L. Hughes, from a judgment of the Supreme Court in favor of the defendant, entered

in the office of the clerk of the county of New York on the 22d day of March, 1919, upon a decision of the court dismissing the complaint on the merits and decreeing affirmatively that respondent is seized in fee simple absolute of an undivided one-half interest in the real property described in the complaint.

The facts were stipulated.

*Joseph Day Lee* of counsel [*Lee & Wadsworth*, attorneys], for the appellant.

*Samuel Franklin* of counsel [*Bernard H. Levy*, attorney], for the respondent.

DOWLING, J.:

This action was brought to bar the defendant's claim to certain real estate in the city of New York. The parties are sisters, the children of James J. Hanigan, widower, who died intestate, a resident of the city of New York, on December 27, 1917, leaving him surviving the plaintiff and the defendant, and no other child or children, or descendants of a deceased child or children, and no adopted child or children, or descendants of a deceased adopted child or children. For many years prior to 1899 he was the owner of certain real estate in the borough of Manhattan, city of New York. He was a citizen of the United States.

The defendant was born in the United States and has always resided therein. She married Thomas B. Jones prior to 1899 and by him had five children, four of whom still survive. On November 20, 1911, she married Frederick E. Techt in the State of Connecticut, and she, her husband and her four surviving children by her first husband, have resided continuously in the United States. Frederick E. Techt was born in 1883 in Bozen, Tyrol, Austria, of parents who were then Austrian subjects. He came to the United States on November 21, 1907, being then a subject of the Emperor of Austria, and on August 13, 1917, in the Supreme Court, Albany county, N. Y., he declared his intention to become a citizen of the United States. On December 7, 1917, the United States of America, through the President and Congress thereof, declared a state of war to exist between the United

States and the Imperial and Royal Austro-Hungarian Government, and at the date of the death of James J. Hanigan, twenty days thereafter, a state of war existed between the United States and said government. It is conceded that neither defendant, her husband, nor any of her children, has been interned, nor has the loyalty of any of them to the United States been questioned by any Federal, State, city, town or village or other competent authority, tribunal or official thereof, and all of them have been peaceable residents. of the United States. In January, 1918, plaintiff and defendant authorized and empowered one Henry Bassford to collect the rents and income of the real property in question and to manage the same for and on their behalf. Subsequently, plaintiff made a demand on Bassford to turn over to her all of the rents and income, and notified him not to pay any part thereof to defendant; the latter thereupon demanded her one-half of the income. Bassford paid over her one-half to plaintiff but refused to pay over the other one-half to defendant until the court decides who is entitled thereto. Plaintiff thereupon brought this action to obtain a judgment that defendant be barred from all claims to any estate in the property belonging to her father and from all interests or liens therein or thereon.

Plaintiff contends that on the date of her father's death her sister was an alien enemy and, therefore, could not inherit lands in this State under the Real Property Law. Defendant claims that she was an alien friend and, therefore, entitled to take under said law.

Down to 1913 the tenure of land in this State was limited as follows (Real Prop. Law [Consol. Laws, chap. 50; Laws of 1909, chap. 52], § 10):

" § 10. Capacity to hold real property. 1. A citizen of the United States is capable of holding real property within this State, and of taking the same by descent, devise or purchase.

" 2. Any citizen of a State or nation which, by its laws, confers similar privileges on citizens of the United States, may take, acquire, hold and convey lands or real estate within this State, in the same manner and with like effect as if such person were, at the time, a citizen of the United States; pro-

vided, however, that nothing herein contained shall affect the rights of this State in any action or proceedings for escheat instituted before May nineteenth, eighteen hundred and ninety-seven."

Section 12 of the Real Property Law provided for the filing of a deposition by an alien who, pursuant to the laws of the United States, had declared his intention to become a citizen and who was and intended to remain a resident thereof; and section 13 provided that an alien filing said deposition might, for a term of six years after such filing, take, hold, convey and devise real property. It contained provisions for devise and succession in case the alien died before the six years had expired. Section 14 provided as follows:

"§ 14. Effect of woman's marriage with alien. Any woman born a citizen of the United States, who shall have married or shall marry an alien, and the foreign-born children and descendants of any such woman, shall, notwithstanding her or their residence or birth in a foreign country, be entitled to take, hold, convey and devise real property situated within this State in like manner, and with like effect, as if such woman and such foreign-born children and descendants were citizens of the United States;  *  *  *."

During the same period the law as to devises of real property to aliens was as follows (Decedent Estate Law [Consol. Laws, chap. 13; Laws of 1909, chap. 18], § 13):

"Every devise of any interest in real property, to a person who, at the time of the death of the testator, shall be an alien, not authorized by statute to hold real estate, shall be void. The interest so devised, shall descend to the heirs of the testator; if there be no such heirs competent to take, it shall pass under his will to the residuary devisees therein named, if any there be, competent to take such interest."

By chapter 152 of the Laws of 1913 it was enacted:

"An act to amend the Real Property Law, in relation to tenure of real property by aliens.  *  *  *

"Section 1. Section ten of chapter fifty-two of the laws of nineteen hundred and nine, entitled 'An act relating to real property, constituting chapter fifty of the Consolidated Laws,' is hereby amended to read as follows:

"§ 10. Capacity to hold real property. 1. A citizen of the

United States is capable of holding real property within this State, and of taking the same by descent, devise or purchase.

" 2. Alien friends are empowered to take, hold, transmit and dispose of real property within this State in the same manner as native-born citizens and their heirs and devisees take in the same manner as citizens; provided, however, that nothing herein contained shall affect the rights of this State in any action or proceeding for escheat instituted before May nineteenth, eighteen hundred and ninety-seven.

" § 2. Sections twelve, thirteen and fourteen of such chapter are hereby repealed."

At the same time there was passed a companion bill (Laws of 1913, chap. 153) repealing section 13 of the Decedent Estate Law heretofore quoted.

Thus, there was left no express limitation upon the devise of real property to an alien, while there seems to be a limitation of the right to purchase, dispose of or succeed to real property by alien friends. No reason for the difference in policy is suggested. Defendant's right to inherit from her father must depend, however, upon whether she is, in contemplation of law, an alien friend or an alien enemy.

Chapter 152 of the Laws of 1913 contains no definition of who is an alien friend. Admittedly, defendant, as the wife of an Austrian subject, takes under our Federal statute the political status of her husband and became a subject of Austria herself upon her marriage. (34 U. S. Stat. at Large, 1228, chap. 2534, § 3; *Mackenzie* v. *Hare*, 239 U. S. 299.) But, while this makes her an alien, it does not necessarily make her an alien enemy. In the *Mackenzie* case the question involved was a political right — that of suffrage — and not a property right. The right of an American-born woman, although married to an alien, to take by inheritance an undivided share in the real estate left by her father (irrespective of statute) was upheld in *Wright* v. *Saddler* (20 N. Y. 320).

The trend of decisions here and in England since the World War began has been to recognize and enforce the civil rights of aliens domiciled in a country whose laws they have respected and who have observed the rules of conduct laid down for their guidance by competent authority. Thus, resident aliens have been accorded rights denied to citizens still resident in an

enemy country. This court, in *Arndt-Ober* v. *Metropolitan Opera Co.* (182 App. Div. 513) upheld the right of an alien, a subject of Germany, to sue in our courts because she was a resident here and had conducted herself in accordance with regulations. That the real test to be applied is, in the first place, the place of actual residence of the person whose status is sought to be determined, was thus indicated by the chief justice of England, Lord READING, in *Porter* v. *Freudenberg* (L. R. [1915] 1 K. B. 857, 868): "Trading with a British subject or the subject of a neutral State carrying on business in the hostile territory is as much assistance to the alien enemy as if it were with a subject of enemy nationality carrying on business in the enemy State, and, therefore, for the purpose of the enforcement of civil rights, they are equally treated as alien enemies. It is clear law that the test for this purpose is not nationality but the place of carrying on the business."

And in *Janson* v. *Driefontein Consolidated Mines, Ltd.* (L. R. [1902] A. C. 505) Lord LINDLEY had said at an earlier date: "But when considering questions arising with an alien enemy, it is not the nationality of a person but his place of business that is important. An Englishman carrying on business in an enemy's country is treated as an alien enemy in considering the validity or invalidity of his commercial contracts; *McConnell* v. *Hector* (3 B. & P. 113). Again, a subject of a State at war with this country but who is carrying on business here or in a foreign neutral country, is not treated as an alien enemy; the validity of his contract does not depend on his nationality, nor even on what is his real domicile, but on the place or places in which he carries on his business or businesses; *Wells* v. *Williams* (1 Ld. Raym. 282). As observed by Sir WILLIAM SCOTT in *The George Klassina* (5 Ch. Rob. 302): 'A man may have mercantile concerns in two countries, and if he acts as a merchant of both he must be liable to be considered as a subject of both with regard to the transactions originating, respectively, in these countries. That he has no fixed counting house in the enemy's country will not be decisive.' See also *The Portland* (3 Ch. Rob. 41)."

As to this opinion of Lord LINDLEY, Lord READING said (*Porter* v. *Freudenberg, supra,* at p. 868): "Lord LINDLEY's statement was not intended to be, and is not exhaustive. His

Lordship, for the purposes of the appeal then before the House of Lords, was considering the character of a trading corporation, and did not purport to deal with persons residing but not carrying on business in the enemy territory. Such a person is equally treated as an alien enemy provided he is voluntarily resident there, having elected to live under the protection of the enemy State. For the purpose of determining civil rights, a British subject or the subject of a neutral State who is voluntarily resident or who is carrying on business in hostile territory, is to be regarded and treated as an alien enemy and is in the same position as a subject of hostile nationality resident in hostile territory." And again (at p. 872): "In Walford's Treatise on the Law Respecting Parties to Actions, published 1842, there is a chapter in vol. 1, p. 647, dealing with disabilities of civil origin which well repays close and diligent study. When treating of alien enemies the learned author at p. 650 thus states the law: 'Alien enemies are distinguishable according as they are under the King's special protection or not. If an alien enemy came here under a safe conduct or is commorant here by the King's license and under his protection he seems to stand in the same position as to the right of maintaining actions in our Court as an alien friend, a right of suing being an incidental right to protection,' that is, he is no longer under the disability attaching to an alien enemy."

So in the case of *Princess Thurn and Taxis* v. *Moffitt* (L. R. [1915] 1 Ch. 58), cited with approval by this court in the *Arndt-Ober Case* (*supra*), it was said: "It is not contested that Prince Victor is an alien enemy as being a subject of Austria-Hungary or that he is abroad and probably engaged in fighting against this country; but although that may be the the case so far as Prince Victor is concerned, the plaintiff, who was originally an American lady and has on the view of the facts put forward by her become an alien enemy by virtue of her marriage, resides in the United Kingdom and has duly registered herself under the recent Act and Order in Council.   *   *   *

"The law applicable to the circumstances is, in my opinion, correctly stated in Hall's International Law (6th ed., page 388) as follows: 'When persons are allowed to remain, either

for a specified time after the commencement of war, or during
good behavior, they are exonerated from the disabilities of
enemies for such time as they in fact stay, and they are placed
in the same position as other foreigners, except that they cannot
carry on a direct trade in their own or other enemy vessels
with the enemy country."

That the utmost effort was used to mitigate the conse-
quences of war as to all aliens resident in this country and
faithfully obeying its laws, is shown by the history of the
regulations issued for their conduct. This country was loath
to declare any individual an alien enemy who respected her
asylum here and was faithful to its laws. The Federal statute
regarding the removal of alien enemies in force when Hanigan
died was as follows (U. S. R. S. §§ 4067, 4068, revising
1 U. S. Stat. at Large, 577, chap. 66, § 1; 2 id. 781, chap. 130,
originally passed as far back as 1798):

"Removal of alien enemies. Sec. 4067. Whenever there
is a declared war between the United States and any foreign
nation or government, or any invasion or predatory incursion
is perpetrated, attempted, or threatened against the territory
of the United States, by any foreign nation or government,
and the President makes public proclamation of the event,
all natives, citizens, denizens, or subjects of the hostile nation
or government, being males of the age of fourteen years and
upward, who shall be within the United States, and not
actually naturalized, shall be liable to be apprehended,
restrained, secured, and removed, as alien enemies. The
President is authorized, in any such event, by his proclamation
thereof, or other public act, to direct the conduct to be observed,
on the part of the United States, toward the aliens who become
so liable; the manner and degree of the restraint to which they
shall be subject, and in what cases, and upon what security
their residence shall be permitted, and to provide for the
removal of those who, not being permitted to reside within
the United States, refuse or neglect to depart therefrom; and
to establish any other regulations which are found necessary
in the premises and for the public safety.

"Time for removal. Sec. 4068. When an alien who
becomes liable as an enemy, in the manner prescribed in the
preceding section, is not chargeable with actual hostility,

or other crime against the public safety, he shall be allowed, for the recovery, disposal, and removal of his goods and effects, and for his departure, the full time which is or shall be stipulated by any treaty then in force between the United States and the hostile nation or government of which he is a native citizen, denizen, or subject; and where no such treaty exists, or is in force, the President may ascertain and declare such reasonable time as may be consistent with the public safety, and according to the dictates of humanity and national hospitality."

It will be noted that defendant does not come within the class of alien enemy herein defined, for that is limited to natives, citizens, denizens or subjects of the hostile government, being males of the age of fourteen years and over. The President is authorized by proclamation to direct the conduct to be observed towards such aliens. What did he do as to subjects of Austria? On December 11, 1917, in the proclamation which he issued declaring the existence of a state of war between the United States and the Imperial and Royal Austro-Hungarian Government, he proclaimed:

" And, acting under and by virtue of the authority vested in me by the Constitution of the United States and the aforesaid sections of the Revised Statutes, I do hereby further proclaim and direct that the conduct to be observed on the part of the United States towards all natives, citizens, denizens, or subjects of Austria-Hungary, being males of the age of fourteen years and upwards, who shall be within the United States and not actually naturalized, shall be as follows:

" All natives, citizens, denizens, or subjects of Austria-Hungary, being males of fourteen years and upwards, who shall be within the United States and not actually naturalized, are enjoined to preserve the peace towards the United States and to refrain from crime against the public safety, and from violating the laws of the United States and of the States and Territories thereof, and to refrain from actual hostility or giving information, aid or comfort to the enemies of the United States, and to comply strictly with the regulations which are hereby or which may be from time to time promulgated by the President; and so long as they shall conduct themselves in accordance with law, they shall be undisturbed in the peaceful pursuit of their lives and occupations and be accorded

the consideration due to all peaceful and law-abiding persons, except so far as restrictions may be necessary for their own protection and for the safety of the United States; and towards such of said persons as conduct themselves in accordance with law, all citizens of the United States are enjoined to preserve the peace and to treat them with all such friendliness as may be compatible with loyalty and allegiance to the United States.

" And all natives, citizens, denizens or subjects of Austria-Hungary, being males of the age of fourteen years and upwards, who shall be within the United States and not actually naturalized, who fail to conduct themselves as so enjoined, in addition to all other penalties prescribed by law, shall be liable to restraint, or to give security, or to remove and depart from the United States in the manner prescribed by sections four thousand and sixty-nine and four thousand and seventy of the Revised Statutes, and as prescribed in regulations duly promulgated by the President;

" And pursuant to the authority vested in me, I hereby declare and establish the following regulations, which I find necessary in the premises and for the public safety:

" (1) No native, citizen, denizen or subject of Austria-Hungary, being a male of the age of fourteen years and upwards and not actually naturalized, shall depart from the United States until he shall have received such permit as the President shall prescribe, or except under order of a court, judge, or justice, under sections 4069 and 4070 of the Revised Statutes;

" (2) No such person shall land in or enter the United States, except under such restrictions and at such places as the President may prescribe;

" (3) Every such person of whom there may be reasonable cause to believe that he is aiding or about to aid the enemy, or who may be at large to the danger of the public peace or safety, or who violates or attempts to violate, or of whom there is reasonable ground to believe that he is about to violate any regulation duly promulgated by the President, or any criminal law of the United States, or of the States or Territories thereof, will be subject to summary arrest by the United States Marshal, or his deputy, or such other officer as the President shall

designate, and to confinement in such penitentiary, prison, jail, military camp, or other place of detention as may be directed by the President." (40 U. S. Stat. at Large, —— ——.)*

In all this it will be seen there is no definition of women as alien enemies nor is their status declared to be different from that of citizens or neutrals.

After the death of Hanigan, and on April 19, 1918, another proclamation was issued by the President, reciting that Congress had passed an act approved April 16, 1918,† extending the scope of section 4067 of the Revised Statutes so as to include women, wherefore he extended the regulation for the conduct of subjects of Austria-Hungary contained in his original proclamation so as to apply to " females of the age of fourteen years and upwards, who shall be within the United States and not actually naturalized." (40 U. S. Stat. at Large, ——, ——.)‡ But nowhere therein are they characterized as alien enemies. The status of aliens, subjects of countries with which we are at war, but who reside here and obey our laws, has already been before the courts for determination.

The case of *State ex rel. Constanti* v. *Darwin* (102 Wash. 402; 173 Pac. Rep. 29) was a proceeding to compel the State Fish Commissioner to issue a fishing license to the relator for the Puget Sound district. It appeared that relator was an Austrian who had declared his intention to become a citizen and was law-abiding. The application was resisted by the Attorney-General on the ground that the relator was an alien enemy. The court granted the writ. Mr. Justice MOUNT, after setting forth the Austrian proclamation of December 11, 1917, says at page 407:

" On the next day after this proclamation was issued, the Attorney General of the United States, referring to it, said: ' This proclamation differs from the preceding proclamation

* See Pamph. Stat. 65th Cong. Sess. 2, 1917–1918, Pt. 2, Proc. pp. 85–87. — [REP.

† See 40 U. S. Stat. at Large, 531, chap. 55, amdg. U. S. R. S. § 4067.— [REP.

‡ See Pamph. Stat. 65th Cong. Sess. 2, 1917–1918, Pt. 2, Proc. pp. 128, 129.— [REP.

relating to the subjects of the German Empire in that, while it authorizes the arrest and internment of any subjects of the dual empire whose conduct may be a menace to the safety of the country, the only restrictions which it contains are prohibitions against either entering or leaving the United States without first obtaining permission. Many subjects of Austria-Hungary have already demonstrated their strong loyalty to this country by their faithfulness in industrial work, their organization of recruiting committees, and in service with our armies. For the present, therefore, no restrictions will be placed upon the movements of subjects of Austria-Hungary. They are not subject to the restrictions of the previous proclamations relating to German enemy aliens; they will be permitted to reside and labor in prohibited areas and to travel freely without molestation. Only those who are dangerous or disloyal are subject to arrest.' * * *

" So it is apparent that this proclamation recognizes such persons as friendly aliens and not as alien enemies. That the Legislature may prohibit any but citizens of this State and of the United States from receiving a fishing license within the State admits of no doubt. It has not done so. That the Federal Government may establish the status of a subject of an enemy country residing within the United States also admits of no doubt. It has done so by authorizing the proclamation above quoted. That the Federal Government, or the President of the United States under authority of Congress, may nullify the statute with reference to permitting privileges to aliens who have declared their intention to become citizens of the United States admits of no doubt. In our opinion, this has not been done. But before the terms of the statute may be nullified or suspended by Congress, or by the President acting under authority of Congress, the intention to do so must be clear. We think such intention is not clear. On the other hand, it seems entirely clear that the proclamation of the President relating to natives of Austria-Hungary, quoted above, intended to preserve the rights of such persons in this country to follow their peaceful pursuits and occupations and to accord them the consideration due to all peaceful and law-abiding persons under the law of their domicile."

*Tortoriello* v. *Seghorn* (—— N. J. Eq. ——; 103 Atl. Rep. [Court

of Chancery of N. J., March 12, 1918] 393) was an action to compel the specific performance of a contract for the sale of certain real estate on Warwick street, in the city of Newark, where all the parties reside.

The facts in the case were undisputed. Defendants refused to perform their contract and convey the premises in question to complainant, because they claimed they were advised that to do so would make them subject to the penalties of fine and imprisonment imposed by the act of Congress, approved October 6, 1917, and known as the " Trading with the Enemy Act" (40 U. S. Stat. at Large, 411, chap. 106), as they are not citizens of the United States and were born in the German Empire and are considered subjects of that country, with which this country is at war; and they further claimed that they had been advised that by reason of their German citizenship they are considered alien enemies, and are not permitted under the act to complete their contract, and convey their property.

The court, by FOSTER, V. C., says (at pp. 394, 395): " The word ' enemy ' under the Trading with the Enemy Act is defined therein as follows:

" ' Sec. 2 (a) Any individual, partnership or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory.

" ' (b) The Government of any nation with which the United States is at war, or any political or municipal subdivision thereof, or any officer, official, agent, or agency thereof.

" ' (c) Such other individuals or body or class of individuals, as may be natives, citizens or subjects of any nation with which the United States is at war, other than citizens of the United States, wherever resident or wherever doing business, as the President if he shall find the safety of the United States or the successful prosecution of the war shall so require may, by proclamation, include within the term " enemy." '

" Defendants and those advising them assume that because they were born in Germany and are subjects of that nation, they are therefore to be regarded not only as aliens, but as alien enemies, under the terms of the Trading Act; in fact, they assume that every native, citizen or subject of a nation with which we are at war is classed as an enemy. There is nothing in the Act, however, to warrant this assumption. As the defendants are resident of this State, and as neither of them, so far as the record discloses, is an officer, official or agent of Germany, or of any political or municipal subdivision thereof, they do not therefore come within the congressional definition of the term ' enemy ' set forth in the above-quoted paragraphs (a) and (b). If they are to be brought within the prohibition of the act, it must be under the provisions of paragraph (c); and they can only be brought within the description of an ' enemy ' under this paragraph, by virtue of the proclamation of the President. The only proclamation of the President relating to this subject, that has come to my attention, is the one of February 5, 1918,* wherein the President finds and proclaims:

" ' That all natives, citizens and subjects of the German Empire or the Austro-Hungarian Empire, who    *    *    *    have been heretofore or may be hereafter transferred after arrest unto the custody of the War Department for detention during the war, shall be included within the meaning of the word " enemy " for the purposes of the Trading with the Enemy Act, and for such trading    *    *    *    every such alien enemy who is so transferred after arrest into the custody of the War Department for detention during the war shall be and hereby is included within the meaning of the word " enemy " and shall be deemed to constitute an " enemy " for such purposes.'

" As the record does not show that either of the defendants has been arrested and transferred into the custody of the War Department for detention during the war, it is clear that they do not come within the meaning of the word ' enemy ' as defined in the proclamation of the President; and from

---

* See 40 U. S. Stat. at Large, ——; Pamph. Stat. 65th Cong. Sess. 2, 1917-1918, Pt. 2, Proc. p. 101.— [REP.

what has been said, it is apparent that neither the facts nor the law support defendants' position.

" It is true that some text books on international law and some of the older cases hold that the natives, citizens and subjects of one belligerent are enemies of the country with which it is at war; and that such persons cannot ordinarily trade in or transact business within such country.   The more modern, and I believe the better, view is, that since the Congress has assumed jurisdiction over the subject and has enacted legislation with respect thereto, such legislation, and not the theories and speculations of writers, however eminent, should control in determining the status of aliens while this country is at war.   *   *   *

" Congress in the Trading with the Enemy Act, aside from the power thereby vested in the President, has made the test of enemy character depend upon residence, or official or agency relation, and not upon nationality, or mere alienage. The President by his proclamation has extended the ban upon trading only to such aliens as have been or may be arrested and interned in the custody of the War Department for the duration of the war; and with his intimate knowledge of the situation, he has not yet found it necessary to include within the meaning of the word ' enemy ' other individuals who may be natives, citizens or subjects of the German Empire. As a result of this forbearance, aliens not so classified have been at liberty to continue in the pursuit of their business and trade, including the receipt, banking and expenditure of money belonging to them, without the slightest governmental interference or supervision.   Such being the case, there is no reason apparent why an exception should be made with respect to transactions relating to real estate; and if such an exception is to be made, I cannot think of a satisfactory reason why courts should assume the prerogative of making it, as the Congress has expressly vested that power in the President; and we require no assurance that he will wisely exercise it when and as the exigencies of the situation call upon him for action.

" My conclusion is that the defendants are not ' enemies ' within the meaning of the Trading with the Enemy Act, or the President's proclamation issued thereunder, and that the

record discloses no legal obstacle that prevents them from performing their contract with complainant."

The above case has been cited and quoted with approval by the Court of Errors and Appeals of New Jersey in the case of *Heiler* v. *Goodman's Motor Express Van & S. Co.* (—— N. J. L. ——; 105 Atl. Rep. [November 18, 1918] 233.)

Plaintiff contends that it must be assumed that the Legislature used the words " alien friends " in its strict sense of a citizen or subject of a State not at war with us. It is quite true that the usual and customary definition of an alien enemy has been, as the legal and other dictionaries define it — " a subject of a nation which is at war with this country," while an alien friend is the subject of a nation which is at peace with this country. But the humane and considerate treatment accorded by this country to aliens resident within the borders since its entry into the World War is characteristic of the spirit in which the laws should be administered as to the issues which war conditions have raised. I think, based upon all Federal statutes, our governmental course of action and the decisions already made here and abroad, that an alien friend within the meaning of our Real Property Law is not merely a resident subject of a nation with which we are at peace, but also a resident subject of a nation with which we are at war, but who has observed to the letter our laws and our regulations laid down for his conduct, and who in return will be protected by this country in all his civil and property rights, while he so conducts himself.

The injustice of visiting upon the innocent the consequences of acts for which they are in no way responsible, is demonstrated by the present case. Here is an American-born woman, loyal and lawabiding, who through statutory rule has acquired the political status of her foreign-born husband, who himself is a resident, has declared his intention of becoming a citizen of this country and is likewise loyal and lawabiding. Her father dies intestate and normally she would inherit half of his real property. But because twenty days earlier a state of war had been declared to exist between the country of her birth and residence and that of her husband's birth, it is sought to declare her an alien enemy and deprive her of her birthright, to benefit her sister. Peace will

soon be declared with Austria and she will once again, even under plaintiff's contention, become an alien friend, until her husband can become an American citizen, when she will be restored to American citizenship. But her rights could never be restored to her and her share of her father's estate could never again be hers. Such a result is abhorrent to every idea of justice and equity, and the help of the courts should not be given to accomplish it.

The judgment appealed from should be affirmed, with costs.

CLARKE, P. J., SMITH, PAGE and PHILBIN, JJ., concurred.

Judgment affirmed, with costs.