This cause is submitted for determination on the bill of complaint and an answer confessing the verity of all of the factual allegations of the bill. The topic predominantly in controversy is one of relative interest in the present period of national hostilities.
Concisely stated, the significant facts are that in October, 1937, the complainants, husband and wife, acquired by deed certain tracts of land situate in the Township of Clinton, Hunterdon County, New Jersey. They have ever since retained the lands as tenants by the entirety and the exercise of the rights of ownership and possession of the lands by the complainants has not been challenged in any action or proceeding initiated by any federal or state governmental authority or agency. *Page 561 
On June 5th, 1942, the complainants, by an agreement in writing, obligated themselves to sell and convey by deed of warranty the lands and premises (together with specified live stock and designated farming equipment) to the defendant for the purchase price of $22,500. The date ultimately selected by the parties for the consummation of the sale was July 22d 1942, on which occasion the complainants tendered to the defendant the requisite deed and bill of sale.
The defendant thereupon declined to accept these instruments of title from the complainants and to pay the balance of the purchase price in pursuance of the terms of the agreement for the announced reason that she was advised that the title to the lands was then unmarketable.
It is acknowledged that the complainant Basil A. Caparell, although a resident of New Jersey, was on July 22d 1942, and indeed is now, a subject of the Kingdom of Italy, with which nation the United States of America was then and is now at war.
Although the controversial issues introduce the concept of an "alien enemy," yet it is apparent that the present litigation is of a friendly temper for, it is stipulated (a) that the marketability of the title to the realty shall be determined as of July 22d 1942, and not as of the date of the decree (Vide,Gerba v. Mitruske, 84 N.J. Eq. 141; 94 Atl. Rep. 34): and (b) that in the event the defendant is sustained in her refusal to accept title, the complainants be decreed to repay to the defendant the down payment and certain specified sums to reimburse her for her incidental expenditures. The complainants invoke the aid of the Uniform Declaratory Judgments Law (R.S.2:26-66 to 79, both inclusive) and also pray for a decree of specific performance.
Whether propounded by counsel or not, certain questions which deserve some explanation seem to me to emerge from the acknowledged facts. Initially, is the complainant (the alien) privileged to institute and maintain a suit in this court? The primary rule of the English common law which excluded all alien enemies from the courts (except, perhaps, from the Court of Chancery, Y.B. 13 Ed. III f.9) has in the passage of time experienced so many substantial relaxations *Page 562 
as to cause its extinction intrinsically in the country of its common law origin. This rule in its original severity was never compatible with the American conceptions of justice and humanity, and it was quite promptly overrun by exceptions and modifications until it is now definitely assured that aliens who are subjects of a hostile country and nevertheless residing and lawfully conducting themselves and their affairs within this jurisdiction with the acquiescence and under the protection of our government, are not now forbidden to use our courts. Even in other respects, it may now be broadly stated that the rule is at present only employed to prohibit the use of our courts by alien enemies in the accomplishment of some purpose designed to impede our prosecution of the war or to lend aid to the enemy. Heiler v.Goodman's Motor, c., Co. (1918), 92 N.J. Law 415;105 Atl. Rep. 233; Posselt v. D'Espard, 87 N.J. Eq. 571;100 Atl. Rep. 893; Tortoriello v. Seghorn, reported only in103 Atl. Rep. 393. To one who desires to pursue the subject, the following citations may be of assistance: Clarke v. Moury, 10 Johns
(N.Y.) 69; 1 Coke, Littleton 129-b; Pollock and Maitland,History of English Law, Vol. 1 (2d ed.) 459; Otteridge v.Thompson, Fed. Cas. No. 10,618, 2 D.C. 108 (1814);Arndt-Ober v. Metropolitan Opera Co., 182 App. Div. 513;169 N Y Supp. 942; Hughes v. Techt, 188 App. Div. 743;177 N.Y. Supp. 420; affirmed, 229 N.Y. 222; certiorari denied,254 U.S. 643; Daimler v. Continental Tyre and Rubber Co., Ann. Cas. 1917C, 170, 204; recent cases, Vide, Bernheimer v. Vurpillot
(C.C.A.), 130 Red Rep. 2d 396, and Ex parte KumezoKawato, 87 L.Ed. Advance Opinions 94.
Moreover, no objection to the prosecution of the present cause has been interposed by the defendant's answer or otherwise.Heiler v. Goodman's Motor, c., Co., supra. The presumption is therefore indulged that the alien complainant is a resident peaceably and lawfully conducting his activities under the protection of our laws. In such status, he is entitled to sue, unless restrained by some legislation or valid governmental proclamation.
Under date of January 31st, 1942, the Attorney-General *Page 563 
of the United States issued the following statement to clarify the rights of natives, citizens or subjects of enemy countries:
"Any person who is an `enemy' for purposes of the Trading with the Enemy Act is prohibited by Section 7 (b) of that Act from prosecuting suits in any court within the United States prior to the end of the war.
"For purposes of the Trading with the Enemy Act, an `enemy' is defined by Section 2 to mean any person, of any nationality, resident within the territory of, or the territory occupied by, any nation with which the United States is at war. Under subdivision (c) of that Section, the President is authorized by proclamation, to include within the term `enemy,' any individuals or class of individuals who may be natives, citizens, or subjects of any nation with which the United States is at war, eventhough such individuals or class of individuals may be residentin the United States, if the President shall find that the safety of the United States or the successful prosecution of the war so requires. No such proclamation under Section 2 of the Trading with the Enemy Act has been issued.
"Proclamations have been issued by the President which govern the conduct to be observed by alien enemies in this country and which delegate to the Attorney General the authority to apprehend and detain specified alien enemies whom the Attorney General deems dangerous to the public peace and safety of the United States.
"These proclamations were issued under the authority granted by Section 21 of Title 50, United States Code, and careful note should be taken of the fact that they are not in any way an exercise of the power vested in the President by the above-mentioned section 2(c) of the Trading with the Enemy Act.
"Accordingly, it is important to note that no native, citizen, or subject of any nation with which the United States is at war and who is resident in the United States is precluded by federal statute or regulations from suing in federal or state courts."
It is next observed that the complainants endeavor to resort to the provisions of the Uniform Declaratory Judgment Law, supra, to enable them to obtain an adjudication of the rights of the parties. A mere determination of the legal title to land is cognizable only at law. The statute ordains that the courts "within their respective jurisdictions" may render declaratory judgments and decrees. Thropp v. Public Service Electric Co.,84 N.J. Eq. 144; 93 Atl. Rep. 693; Paterson v. Currier, 98 N.J. Eq. 48; 129 Atl. Rep. 711; Wight v. Board of Education,Westfield, 99 N.J. Eq. 843; 133 Atl. Rep. 387. In Yuras v.Muscowic, 114 N.J. Eq. 126; *Page 564 168 Atl. Rep. 657, it was held that where the question raised by the pleadings filed under the Uniform Declaratory Judgment Act involved only the legal title to land, impugned solely by contentions of a legal character, the Court of Chancery had no jurisdiction even though the parties stipulated to waive the right to appeal. See, also, Union Trust Co. v. Goerke Co.,103 N.J. Eq. 159; 142 Atl. Rep. 560; Investment Building and LoanAssociation v. Preisendanz, 120 N.J. Eq. 441;185 Atl. Rep. 507; Paterson v. North Jersey District Water Supply Commission,124 N.J. Eq. 344; 2 Atl. Rep. 2d 42. Ordinarily, the question whether parties are bound by an alleged contract is purely legal and must be submitted for solution to a court of law. Moresh v. O'Regan, 122 N.J. Eq. 388; 192 Atl. Rep. 831;Christiansen v. Local 680, Milk Drivers, 126 N.J. Eq. 508;10 Atl. Rep. 2d 168. Counsel cannot by mere silence or by express consent confer upon courts of equity the power to determine litigated matters which, under our judicial system, must be settled in a court of law. Long Branch v. Hoch,99 N.J. Eq. 356; 131 Atl. Rep. 889.
Assuredly, there are cases conspicuously exemplified in our Chancery practice in which this court may by decree and injunction enforce legal rights in real estate emanating from the express or implied terms of a contract. Hart v. Leonard,42 N.J. Eq. 416; 7 Atl. Rep. 865. Among such, are those in which the power to compel specific performance is implored. Therefore, the prayer for relief of this nature rescues the present bill. The specific performance of contracts is a mode of redress grounded upon the impracticability or inadequacy of legal remedies. Brown v. Brown, 33 N.J. Eq. 650.
The culminating point may now be considered. The question presented by agreement of counsel is: Was the title of the complainant Basil A. Caparell marketable on July 22d 1942? The question which will be considered is whether the title of the alien complainant was, on the designated date, sufficiently free of reasonable doubt as to induce this court in equity and sound judgment to oblige the defendant to take it. *Page 565 
It must be acknowledged that treaties made under the authority of the United States are supreme law, anything in the constitution or laws of any state to the contrary notwithstanding. United States Constitution,article VI, section 2; Hauenstein v. Lynham, 100 U.S. 483, 488; Santovincenzo v.Egan, 284 U.S. 30, 40; Geofroy v. Riggs, 133 U.S. 258;33 L.Ed. 613; Delassus v. United States, 9 Pet. (U.S.) 117;9 L.Ed. 71; Orr v. Hodgson, 4 Wheat. (U.S.) 453; 4 L.Ed. 613;Cherac v. Cherac, 2 Wheat. (U.S.) 259; 4 L.Ed. 234;Schultze v. Schultze, 144 Ill. 290; 33 N.E. Rep. 201;19 L.R.A. 90; 36 Am. St. Rep. 432; 8 Geo. Wash. L.R. 11.
Counsel have not directed my notice to any treaty (nor have I detected any) from which the alien complainant derives any special rights in respect of the conveyance of real estate in the existing circumstances. It was merely conjectural that the complainant might be assured of some reciprocal rights in the ownership and alienation of real estate by virtue of the Treaty of Commerce and Navigation between the United States and Italy, signed at Florence on February 26th, 1871, and the treaty of 1913 amending article III of the Treaty of 1871 which was signed at Washington on February 25th, 1913, but upon inquiry it is ascertained that these treaties were terminated on December 15th, 1937, as the result of an official notification given by the Governments of the United States and Italy to each other on December 15th, 1936, in accordance with article XXV of the Treaty of 1871.
In the absence of a treaty, it must be conceded that the state has full power to legislate relative to land ownership. InUnited States v. Fox, 94 U.S. 315, 320; 24 L.Ed. 192, Mr. Justice Field, speaking for the court, said: "The power of the state to regulate the tenure of real property within its limits, and the modes of its acquisition and transfer, and the rules of its descent, and the extent to which a testamentary disposition of it may be exercised by its owners, is undoubted. It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government *Page 566 
within whose jurisdiction the property is situated. McCormick
v. Sullivant, 10 Wheat. 202; 6 L.Ed. 300. The power of the state in this respect follows from her sovereignty, within her limits, as to all matters over which jurisdiction has not been expressly or by necessary implication transferred to the federal government. The title and modes of disposition of real property within the state, whether inter vivos or testamentary, are not matters placed under the control of federal authority." AlsoFrick v. Webb, 263 U.S. 326; 68 L.Ed. 323; 44 S.Ct. 115;Terrace v. Thompson, 263 U.S. 197, 217; Webb v. O'Brien,263 U.S. 313; 68 L.Ed. 318; 44 S.Ct. 112; Porterfield v. Webb,263 U.S. 225; 68 L.Ed. 278; 44 S.Ct. 21; Magoun v. Illinois Trustand Savings Bank, 170 U.S. 283; 42 L.Ed. 1037; 18 S.Ct. 594;Donaldson v. State, 67 N.E. Rep. 1029, 1030.
Logically, the research must next converge upon the pertinent statutory law of our state. The Revised Statutes (R.S. 46:3-18) ordain:
"Aliens; rights to acquire, hold and transfer real estate. Alien friends shall have the same rights, powers and privileges and be subject to the same burdens, duties, liabilities and restrictions in respect of real estate situate in this state as native-born citizens.
"Nothing contained in this section shall be construed to:
"a. Entitle any alien to be elected into any office of trust or profit in this state, or to vote at any town meeting or election of members of the senate and general assembly, or other officers, within this state, or for representatives in congress or electors of the president and vice-president of the United States; or
"b. Prevent the sequestration, seizure or disposal by either the state or national government of any real estate or interest therein owned or held by any alien, made pursuant to duly enacted legislation, during the continuance of war between the United States and the government of the country of which any such alien is a citizen or subject."
The sources of this revised enactment are represented to be:Rev. 1877 p. 6 §§ 1 to 3 (Comp. Stat. p. 39 §§ 1 to 3);Rev. 1877 pp. 6, 7 §§ 4, 5 (Comp. Stat. p. 40 §§ 4, 5); P.L.1920 ch. 232 §§ 1, 2; pp. 442, 443 (1924 Supp. §§ 5-14, 5-15). An examination of the records of the Commission on Revision and Consolidation of the Public Statutes disclosed *Page 567 
that the Commission was of the opinion that this section of the revision made no change in the law as it existed at this time of the submission of the revision for enactment. Note, R.S. 1:1-4;1:1-5.
At common law aliens were subject to many disqualifications.
It is noticed that in England exceptions to the common law were made by statutes (7 8 Vict. ch. 66) until in 1870 it was ordained that all property may be acquired, held and disposed of by aliens in the same manner as by native-born British subjects.33 Vict. ch. 14.
In our country, the disability of mere alienage has been extinguished in many states. In some states the disability has been relaxed but is still existent in a limited or restricted scope. 6 Thompson on Real Property 270 § 3127.
A survey of our antecedent legislation reveals that our legislature has with uniformity perpetuated the distinction between alien friends and alien enemies. The discrimination has expression in the use of the words "any alien, not being the subject of any state or power which shall be at the time of such purchase at war with the United States." This phrase may be discovered in our statutory law as early as 1817. The other phrase, "alien friends," is a characteristic of a progression of statutes apparently initiated in 1789. Nothing is perceivable in these statutes to produce the supposition that the distinction between "alien friends" and an alien "being the subject of any state or power * * * at war * * * with the United States" was intended to rest upon the fact of residence.
Thompson in his work on Real Property (§ 3127 apostil 23) enrolls a number of states in which, he asserts, the disability of aliens to take, hold and grant real property is wholly removed. The list also embraces New Jersey, yet he pauses to relate that "in most, if not all, of the above states, the alien must not be an enemy."
In Techt v. Hughes, 229 N.Y. 222; 128 N.E. Rep. 185
(certiorari denied by Supreme Court of United States), the late Mr. Justice Cardozo observed: "In the primary meaning of the words, an alien friend is the subject of a foreign state *Page 568 
at peace with the United States; an alien enemy is the subject of a foreign state at war with the United States (1 Kent Comm. 55;2 Halleck Int. L. (Rev. 1908) 1; Hall Int. Law (7th ed.)403 § 126; Baty Morgan, War: Its Conduct and Legal Results247; 1 Halsbury Laws of England 310; Sylvester's Case, 7 Mod.150; The Roumanian, 1915, Prov. Div. 26; affirmed, 1916, 1 A.C.124; Griswold v. Waddington, 16 Johns. 437, 448; White v.Burnley, 20 How. (U.S.) 235, 249; The Benito Estenger,176 U.S. 568, 571; Kershaw v. Kelsey, 100 Mass. 561; so all the lexicographers, as, e.g., Webster, Murray, Abbott, Black, Bouvier) * * *."
Another excerpt from the opinion of that eminent jurist is appropriate. "The words `alien friend' and `alien enemy' had come down through the centuries, freighted with a significance which they had gained under the old order. The plaintiff has the burden of showing that, as used in this statute, they were filled with a new content." These explications were made concerning a New York statute then similar to our own.
In Breuer v. Berry, 194 Iowa 243; 189 N.W. Rep. 717, 718,
the court remarked: "An alien in this country is a person born out of the United States and unnaturalized under our constitution and laws. An alien enemy is a person who owes allegiance to the adverse belligerent; a foreigner whose country is at war with the country of his residence."
The distinction between alien friends and alien enemies was expressly recognized by Blackstone in Book 1 of hisCommentaries (at p. 372), where he said:
"When I mentioned these rights of an alien, I must be understood of alien friends only, or such whose countries are in peace with ours; for alien enemies have no rights, no privileges, unless by the king's special favour, during the time of war."
It is impressive to notice that our legislature in conferring rights in respect of the ownership of real estate upon alienfriends expressly disclaimed any intention to prevent the sequestration, seizure or disposal of the real estate of an alien enemy pursuant to sovereign authority. R.S. 46:3-18; Cf. R.S.3:3-13; New York Real Property Law § 15. The *Page 569 
meaning of the legislature must be harvested from all they have said.
It must also be at once acknowledged that a legislative intent to alter the common law principles further than is clearly expressed or than the case absolutely required, is not to be inferred. State v. Norton, 23 N.J. Law 33, 40; Tinsman v.Belvidere Delaware Railroad Co., 26 N.J. Law 148, 167; Hill v.Hill, 93 N.J. Eq. 567, 573; 117 Atl. Rep. 256; affirmed, 95 N.J. Eq. 233; 122 Atl. Rep. 818; 2 Lewis' Sutherland StatutoryConstruction § 454.
Mr. Justice Heher, speaking for the Court of Errors and Appeals in the recent case of Camden Trust Co. v. Handle, 132 N.J. Eq. 97; 26 Atl. Rep. 2d 865, remarked: "And, under article X, paragraph 1, of the State Constitution, the common law and statute laws then in effect, not repugnant to the organic law, remained in force until they expired `by their own limitation,' or were `altered or repealed by the legislature.' Vide, State
v. Mairs, 1 N.J. Law 385; Steward v. Chance, 3 N.J. Law 396;Loudon v. Loudon, 114 N.J. Eq. 242; Stemmer v. Kline,128 N.J. Law 455. There are particular reasons why the title to real estate and the incidents of such ownership should be governed by the common law until modified by the legislative authority. It is requisite to a well-ordered society that there be stability and certainty in the law relating to the descent and alienation of real property, the rights and duties pertaining to its ownership and use, and the remedies for injuries thereto; and this requirement is served by the direction of the Constitution that the common law and the statutes then in force should prevail until the legislative power decreed otherwise."
At common law, aliens, though not permitted to take land by operation of law, may take by the act of the parties; but they have no capacity to hold against the state, and the land so taken may be escheated to the state. Fairfax v. Hunter's Lessee, 7Cranch (U.S.) 603, 610 (1813); Gouverneur v. Robertson,11 Wheat. (U.S.) 332 (1826); Hauenstein v. Lynham,supra; Manuel v. Wulff, 152 U.S. 505 (1894); Orr v.Hodgson, supra; Phillipps v. Moore, 100 U.S. 208 (1879);Webb v. O'Brien, supra; Ripley v. Sutherland, 59 *Page 570 App. D.C. 273; 40 Fed. Rep. 2d 780 (1930); cert. den.,282 U.S. 865; Donaldson v. State, supra; Quigley v. Birdseye,11 Montana 439; 28 Pac. Rep. 741 (1892); Rouche v.Williamson, 25 N.C. 141 (1842); Sands v. Lynham, 27Gratt. (Va.) 291 (1876); Scanlan v. Wright, 13 Pick.
(Mass.) 523 (1853); Gibson, Aliens and the Law (1940)36, 40; Techt v. Hughes, supra.
This common law right to take by purchase (grant or devise) applies to alien enemies as well as to alien friends. Fairfax
v. Hunter's Lessee, supra; Yeo v. Mercereau, 18 N.J. Law 387,397 (1842). If an alien died without having made a conveyance of land acquired by purchase, the ownership of the land vested immediately by escheat in the state. Colgan v. McKeon,24 N.J. Law 566, 569; Den v. O'Hanlon, 21 N.J. Law 582, 587. The alien, however, took a defeasible title, subject to the right of the sovereign to deprive him of it, by inquest of office, resulting if successful in "office found." This was a proceeding by which "the fact of alienage is authoritatively established by a public officer, upon an inquest held at the instance of the government." Phillips v. Moore, supra. Moreover, until the land was seized by the state, the alien could occupy and exercise complete dominion over it. Fairfax v. Hunter's Lessee, supra.
The king had no right to the land until office found. Den v.Brown, 7 N.J. Law 305, 343.
I think it has never been supposed that a state of war of itself operates to accomplish a transfer or forfeiture of the title to property held by an enemy alien in the absence of some governmental action to that end. Brown v. United States, 8Cranch. 110; 3 L.Ed. 504; Deutsche Bank und DiscontoGeselbschaft v. Cummins, 65 App. D.C. 297; 83 Fed. Rep. 2d554, 565; reversed on other grounds, 300 U.S. 115; Breuer v.Berry, supra.
A cautious exploration of the authorities discloses that they are concordant in their acceptation of the common law to the length thus stated, but in the present cause the doubt intrudes whether an alien enemy can during the state of war and before the exercise of the sovereign power of seizure, extinguish the right of the state to acquire his real property, *Page 571 
by conveying it (in good faith) to a citizen. Does the citizen receive from the alien enemy a title incapable of annulment by the government in an inquest of office found, or like modern proceeding, instituted under governmental authority after the completion of the conveyance? Ordinarily, sovereign rights are not lost solely by governmental inaction or by the mere adverse conduct of even its citizens. It is perhaps discreet to at once expose the irrelation of the decision in Tortoriello v.Seghorn, supra. There, the vendee sought the decree. The vendor was a German subject and averred that his conveyance would be violative of the federal statute. The vendee did not project for solution any question of the sufficiency of the title which the enemy alien could convey, and the decision does not purport to determine that question.
Therefore, the pertinent inquiry is whether at the common law the sovereign right or power of seizure survives such a grant of the land by an alien enemy. Lord Coke stated the common law to be as follows:
"If an alien Christian or infidel purchase houses, lands, tenements or hereditaments, to him and his heirs, albeit he can have no heirs, yet he is of capacity to take a fee simple but not to hold. For upon an office found, the king shall have it by his prerogative, of whomsover the land is holder. And so it is if the alien doth purchase land and die, the law doth cast the freehold and inheritance upon the king. If an alien purchase any estate of freehold in houses, lands, tenements, or hereditaments, the king upon office found shall have them." 1 Coke on Littleton 2-b.
A later exposition of the common law relative to the subject is found in 2 Kent's Commentaries (at p. 61):
"If the alien should undertake to sell to a citizen, yet the prerogative right of forfeiture is not barred by the alienation, and it must be taken subject to the right of the government to seize the land. His conveyance is good as against himself, and he may, by a fine, bar persons in reversion and remainder, but the title is still voidable by the sovereign upon office found."
The Supreme Court of the United States in the opinion inFairfax v. Hunter's Lessee, supra, made the following comment: "The next question is as to the nature and character *Page 572 
of the title which Denny Fairfax took by the will of Lord Fairfax, he being, at the time of the death of Lord Fairfax, an alien enemy.
"It is clear by the common law, that an alien can take lands by purchase, though not by descent; or in other words he cannot take by the act of law, but he may by the act of the party. This principle has been settled in the Year Books, and has been uniformly recognized as sound law from that time. 11 Hen. 4, 26.14 Hen. 4, 20. Co. Litt. 2 b. Nor is there any distinction, whether the purchase be by grant or by devise. In either case, the estate vests in the alien. Pow. Dev. 316, c. Park Rep. 144.Co. Litt. 2 b. Not for his own benefit, but for the benefit of the state; or in the language of the ancient law, the alien has the capacity to take, but not to hold lands, and they may be seized into the hands of the sovereign. 11 H. 4, 26. 14 H. 4,20. But until the lands are so seized, the alien has complete dominion over the same. He is a good tenant of the freehold in a precipe on a common recovery. 4 Leon. 84. Gouldsb. 102. 10 Nod.128. And may convey the same to a purchaser. Sheafe v.O'Neile, 1 Mass. Rep. 256. Though Co. Litt. 52 b, seems to the contrary, yet it must probably mean that he can convey a defeasible estate only, which an office found will divest."
In Hauenstein v. Lynham, supra, Swayn, J., at p. 484, of the opinion, stated: "The common law as to aliens, except so far as it has been modified by our legislature, is the local law of Virginia. 2 Tucker's Blackst. App., Note C. By that law `aliens are incapable of taking by descent or inheritance, for they are not allowed to have any inheritable blood in them.' 2 Bla. Comm.249. But they may take by grant or devise though not by descent. In other words, they may take by the act of a party, but not by operation of law; and they may convey or devise to another, but such a title is always liable to be divested at the pleasure of the sovereign by office found."
Omitting lengthy explanations of the precise issues therein involved, significant passages will be extracted from some of the early decisions. In Harley v. State, 40 Ala. 689 (at pp. *Page 573 695, 696), the Supreme Court of Alabama asserted: "An alien may acquire lands by purchase, but not by descent, and there is no distinction, whether the purchase be by grant or by devise; in either event, the estate vests in the alien as a defeasible estate, subject to escheat at the suit of the government. He has complete dominion over the estate of which he is thus seized, until office found; may hold it against every one, even against the government, and may convey it to a purchaser — that is to say, may convey a defeasible estate only, subject to be divested on office found."
The ensuing quotation is from People v. Conklin, 2 Hill
(N.Y.) 67 (at p. 71): "Although an alien may take lands by devise, or in any other form of purchase, he cannot hold as against the state. The People may immediately enter — formerly by writ of escheat, and now by ejectment — and oust him of the possession. If the alien convey before office found, the purchaser will not acquire a title, as against the state; and if he die and the heir enter, he must take the land, if he can take at all, subject to the prior and better title of the People by escheat."
In Slater v. Nason, 32 Mass. 345, the court resolved that: "An alien takes to the use of the commonwealth. He must be held to take a freehold by purchase; otherwise the title of the grantor would not be divested; but he cannot hold. And though he may convey by grant, yet he can convey no greater estate than he has. His grant therefore could only convey an estate, defeasible at the suit of the commonwealth."
The subject was discussed in Doe Macdonald v. Cleveland, 6Upper Canada Q.B.O.S. 117: "If the Crown is prepared to show Dyer to be an alien, the Queen can assert her right at any time, and the person deriving title through him must in that case submit to the loss of his estate, whether it be a hardship or not: * * *.
"* * * for I take the law to be that an alien in league may take an estate in fee and hold it for the Crown — in other words, subject to be divested upon office found; and that before office found he may alien to another, whose estate can be only defeated in like manner as his own could have been. I consider that an alien can make a conveyance of real estate, *Page 574 
which will be good against himself and against strangers, subject only to be questioned by the Crown. There is, in my opinion, abundant authority for this, both ancient and modern, and there is nothing that I have seen, certainly no adjudged case, to contradict it; and although in Lord Coke and other text writers passages may be found which are in some parts so expressed as apparently to disaffirm the power of the alien to make a conveyance of land which will enable his alienee to hold over against him, or against strangers, yet in all I have seen and can find on the subject, the meaning is clear, when the expression is carefully considered, that he cannot grant effectually — not so as to assure an indefeasible title; not that his grant will have no effect, even while unquestioned by the Crown. * * *"
Again in Wallace v. Adamson, 10 Upper Canada C.P. Reports338, 345, the court declared: "An alien born may, at common law, hold lands conveyed to him, against any one but the Crown, and he may convey and possibly (though I think not) devise; but still, apart from the effect of particular statutes, the right of the Crown to the lands so purchased by the alien continues, though they have passed into other hands."
A similar conception of the common law is expressed in 2 C.J.1068 § 33:
"But a conveyance by an alien, even to a citizen, conveys as against the government only a defeasible title, and the government's right of forfeiture is not barred."
It is interesting to uncover the terse report of the decision in Fish v. Klein, 2 Mer. 431; 35 Eng. Reprint 1004, written in 1817: "The Master of the Rolls (Sir Wm. Grant) held, that the estate being out of the defendant at the time when the act passed, and the act itself being silent as to the conveyance in question, it was impossible to consider his alienee in any better situation, as to title, than the defendant himself. But that, as it was a new question which had never been expressly decided, the testator's general estate ought to be at the expense of putting it out of controversy." *Page 575 
True, some shadow is cast upon the foregoing statement of the common law by dicta encountered in the perusal of some of the reported decisions of the courts of our country. A reference to a few typical cases will suffice. In Donaldson v. State, supra, it was resolved that the alien could confer title upon the purchaser before office found, but the defeasibility of the title thus transferred was not definitely determined and the authorities therein cited do not support the inference that the title was regarded as entirely stable. In Halstead v. Lake,56 Ind. 363, the authoritative reference is to 2 Kent Com. 61-2
which, as previously observed, was interpreted in the FairfaxCase, supra. Another case is Sheaffe v. O'Neil, 1 Mass. 256,
but listen to the words of Chief-Justice Shaw reported in the later case of Slater v. Nason, 15 Pick. (Mass.) 345.
A diligent and studious effort to ascertain the existing law pertaining to the subject constrains me to adopt the conclusion that in New Jersey the estate or interest of an enemy alien in real property situate within our state is circumscribed by the principles of the common law prevailing at the time of the adoption of article X, paragraph 1, of our State Constitution, and that during the period of war between the United States of America and the nation of which the alien is a subject, the enemy alien cannot extinguish the sovereign power of seizure, sequestration and escheat by diligently conveying his interest or estate to a citizen before the sovereign power is exercised. The authority to modify the common law in this particular reposes in the legislature, although many prudential reasons for the continuance of our present legislative policy are readily conceivable.
An endeavor to ameliorate the common law to fashion it with a figure more attractive to modern view is discernible in the decisions latterly announced by the courts of the States of Wyoming, Washington and California. The courts of our own state, affiliated by constitutional precept with the common law as it then (1844) existed, cannot so freely indulge in such an undertaking. The principal decisions to which I refer are:Dutton v. Donahue, 44 Wyo. 52; 8 Pac. Rep. 2d 90;79 A.L.R. 1355 (1932); Abrams v. *Page 576 State, 45 Wn. 327; 88 Pac. Rep. 327, 331 (1907); Atkinson
v. World, 46 Wn. 104; 89 Pac. Rep. 471 (1907); De Merle
v. Mathews, 26 Cal. 455 (1864); Dunbar v. Shokuta,131 Wn. 291; 230 Pac. Rep. 166 (1924); Mott v. Cline,200 Cal. 434; 253 Pac. Rep. 718, 725 (1927); Oregon v.Carstens, 16 Wn. 165; 47 Pac. Rep. 388 (1915); Prentice
v. Howe, 84 Wn. 136; 146 Pac. Rep. 388 (1915); State v.Kosai, 133 Wn. 442; 234 Pac. Rep. 5, 8 (1925).
These cases enunciate the sentiment that the dignity of the modern state and the trend of modern thought do not favor the enrichment of the sovereign as the result of a "slight technicality" and that legislatures and judicial decisions have been "blazing the way to the open-door policy in dealing with the rights of aliens to acquire and hold real property." Certainly true, as to alien friends and in time of peace. "No longer are there vassals trembling at the rapacity of kings and lords." Whether resident alien enemies, during the period of hostilities with the country to which they owe their allegiance, should possess contrary to the common law property rights of equal vitality and constancy to those of our citizens is appropriately a matter within the domain of the legislature. Nothing short of a statute can invest an enemy alien with all the rights of a natural-born subject in real property.
The cases last mentioned disclose elements which distinguish them from the case at hand. Notably, the status of the alien,i.e., friend or enemy; the transmission of title by descent or purchase; the state of the constitutional provisions and statutory law; the relief desired. These cases, under comparative study admittedly seem to voice some disbelief of the common law rule as expressed by the early authorities. See 3 C.J.S. 586 §22; 2 Am. Jur. 476 § 29. At most, they serve to generate some uncertainty in the authoritative channels of inquiry, which circumstance is of prodigious importance in a suit for specific performance. Pomeroy's Specific Performance of Contracts (3ded.) 507 § 202.
The dubiety of the title to real estate acquired or granted by an alien enemy during World War I is displayed by the legislature of our state in the enactment of P.L. 1920 ch. 305 p. 553 andP.L. 1923 ch. 61 p. 127, designed to quiet *Page 577 
and confirm such titles. Nevertheless, the legislature continued to adhere to the policy of discriminating between the rights of alien friends and those of enemy aliens. Compare New York Real Property Law, section 15.
The notion that specific performance should be denied when the vendor's title is doubtful, without it being necessary for the court to pronounce it bad, was first introduced by Sir Joseph Jekyll (Marlow v. Smith, 2 P. Wms. 198) and by Lord Thurlow (Shopland v. Smith, 1 Bro. C.C. 75). Mr. Justice Chitty Inre Thackeray and Young, 40 Ch. Div. 34, believed, with regard to specific performance, that: "The court * * * must feel such confidence in its own opinion as to be satisfied that another court would not adopt another conclusion."
As early as 1874 our Chancellor conformably stated: "The court will never compel a purchaser to take a title where the point on which it depends is too doubtful to be settled without litigation, or where the purchase would expose him to the hazard of such proceedings; or, as it is usually expressed, it will not compel him to buy a law suit. That may be a good title at law, which a court of equity in the exercise of its discretionary power, will not force on an unwilling purchaser. Every purchaser of land has a right to demand a title which shall put him in all reasonable security, and which shall protect him from anxiety, lest annoying, if not successful suits be brought against him, and probably take from him or his representatives, land upon which money was invested. He should have a title which shall enable him not only to hold his land, but to hold it in peace; and if he wishes to sell it, to be reasonably sure that no flaw or doubt will come up to disturb its marketable value." Dobbs
v. Norcross, 24 N.J. Eq. 327, 330.
In Tillotson v. Gesner, 33 N.J. Eq. 313, 326, Scudder, J., speaking for our Court of Errors and Appeals, explained: "The true rule is stated in 3 Pars. on Con. (6th ed.) [*]380, that if the character of the title be doubtful, although the court were able to come to the conclusion that, on the whole, a title could be made that would not probably be overthrown, this would not be good title enough; for the court has no *Page 578 
right to say that their conclusion, or their opinion, would bind the whole world, and prevent an assault on the title. The purchaser should have a title which shall enable him not only to hold his land, but to hold it in peace; and if he wishes to sell it, to be reasonably sure that no flaw or doubt will come up to disturb its marketable value. The court cannot satisfactorily or conclusively settle a title in the absence of parties who are not before them in the suit to assert their estate or interest in the lands."
Vice-Chancellor Leaming in Richman v. Standard Oil Co., affirmed in 95 N.J. Eq. 745; 123 Atl. Rep. 608, declared: "The recognized rule in specific performances is that while many legal objections to the title should be disposed of by the court, specific performance should not be decreed if there is ground for saying that the question is not settled by previous authorities, or if there are decisions or dicta of weight which show that another judge or another court having the question before it might come to a different conclusion."
The late Vice-Chancellor Backes, with his accustomed conciseness, said: "Where the questions of the marketability of a title, sought to be imposed upon a vendee, is reasonably debatable, in a court of justice, in point of law or fact, specific performance will be denied." Burke v. Dorfan,101 N.J. Eq. 84; 137 Atl. Rep. 844.
The citizenry of the State of New Jersey clothed with the privilege of asserting the sovereign power of seizure are not represented in this cause. Tillotson v. Gesner, supra; Smith
v. Reidy, 92 N.J. Eq. 586; 113 Atl. Rep. 774. To a proceeding or proper action by the state, the adjudication of this cause presents no insurmountable obstacle. At present it seems exceedingly improbable that the title or possession of the defendant to this land would be disturbed by any governmental action, but the defendant has bargained for a title which she can hold without rational anxiety and one, the marketable value of which is not degraded by reasonable and judicious doubt. It is, of course, elementary that a court of equity will not compel a purchaser to accept a doubtful title. Vreeland v. Blauvelt,23 N.J. Eq. 483; Dobbs v. Norcross, supra; Tillotson v. Gesner,supra; Cornell v. *Page 579 Andrews, 35 N.J. Eq. 7; affirmed, 36 N.J. Eq. 321; Van Riper v.Wickersham, 77 N.J. Eq. 232; 76 Atl. Rep. 1020; Smith v.Reidy, supra; Richman v. Standard Oil Co., supra; Burke v.Dorfan, supra; Saracino v. Kosower Construction Co., 102 N.J. Eq. 230; 140 A. 458; Smith v. Neill, 104 N.J. Eq. 339;145 Atl. Rep. 537; Pound v. Pleister, 106 N.J. Eq. 101;150 Atl. Rep. 58; affirmed, 107 N.J. Eq. 577; 153 Atl. Rep. 907; Bank ofMontclair v. Mallas, 120 N.J. Eq. 611; 186 Atl. Rep. 694;affirmed, 121 N.J. Eq. 266; 190 Atl. Rep. 51.
In view of my conclusion that complainant's title is a defeasible one by reason of which this cause must fail, I deem it purposeless to consider the right of the complainant (alien) "to trade" (sell this property) in the light of the provisions of such federal pronouncements as "Trading with the Enemy Act" (Public Act No. 91, 65th Congress, approved October 6th, 1917,chapter 106, 40 Stat. 411, as amended to date, including Public Law 354, 77th Congress, approved December 18th, 1941); Executive Order No. 8389 of April 10th, 1940, as amended by Executive Order No. 8785 of June 14th, 1941, Executive Order No. 8832 of July 26th, 1941, and Executive Order No. 8963, December 9th, 1941; Regulations promulgated by the Secretary of the Treasury on April 10th, 1940, as amended May 10th, 1940, and June 14th, 1941, also February 16th, 1942; President's Order dated February 12th, 1942, delegating all power and authority under sections 3 (a) and 5 (b) of the "Trading with the Enemy Act" to the Secretary of the Treasury; General License No. 42, under Executive Order No. 8389, April 10th, 1940, as amended February 23d 1942, and regulations issued pursuant thereto; Treasury Department Release dated February 23d 1942, relating to the liberalization of freezing control restrictions of refugees and residents of United States; and General Ruling No. 11, Treasury Department Release, March 18th, 1942, as amended September 22d 1942, and November 8th, 1942. Additionally, to have done so would unduly extend this opinion, already a lengthy one.
 Decree to be settled upon notice. *Page 580